Harold J. SILVER, d/b/a Municipal Securities Company, and Municipal Securities Company, Inc., Plaintiffs,

v.

NEW YORK STOCK EXCHANGE, Defendant.

United States District Court
S. D. New York.
June 16, 1961.

Dickstein, Shapiro & Galligan, New York City, Goldberg, Fonville, Gump & Strauss, Dallas, Tex., for plaintiffs; David I. Shapiro, Washington, D. C., of counsel.

Milbank, Tweed, Hope & Hadley, New York City, for defendant; A. Donald MacKinnon, Samuel L. Rosenberry, Edward J. Reilly, Jr., New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

Municipal Securities Company is a sole proprietorship owned by plaintiff Harold Silver, engaged in the securities business, almost entirely in municipal bond transactions. Plaintiff, Municipal Securities Company, Inc., is a corporation organized under the laws of the State of Texas, also engaged in the securities business, principally in the over-the-counter securities market.

Defendant, New York Stock Exchange is a New York unincorporated association with an authorized membership of 1375. The Exchange provides facilities for its members and their firms to trade in corporate securities listed by it. While the actual trading takes place on the floor of the Exchange in New York, its members do business on a nationwide scale. It is the largest and most important of the national stock exchanges. The Exchange has its principal offices and trading facilities at 11 Wall Street in the City of New York.

This suit arises out of the actions of the Exchange in directing a number of its member firms to discontinue private wire and telemeter connections with the plaintiffs and in refusing to continue to furnish plaintiff Municipal, Inc. with its continuous stock ticker quotation service.

The complaint states three separate claims. The first is laid under Sections 4 and 16 of the Clayton Act, 15 U.S.C.A. §§ 15 and 26, and alleges in substance a

conspiracy between the defendant Exchange and various of its member firms, named as co-conspirators but not as parties, to deprive the plaintiffs of their private wire and telemeter connections with such member firms and of the stock ticker service, all to plaintiffs' substantial competitive disadvantage and in violation of the Sherman Act, 15 U.S.C.A. § 1 et seq.

The second and third claims sound in tort and allege that the Exchange tortiously induced its members to breach contracts for wire connections with plaintiffs and caused plaintiffs intentional and wrongful harm without reasonable cause.

We are concerned here only with the first claim under the anti-trust laws. Plaintiffs have moved for partial summary judgment on the first claim under Rule 56(a) and (c), F.R.Civ.P., 28 U.S.C.A., and for such further relief as may be appropriate. Plaintiff Municipal has also moved for preliminary injunctive relief under Section 16 of the Clayton Act.

The motions are before me on voluminous affidavits submitted by both sides and a volume of supplementary material.

Jurisdiction over the first claim is based on 15 U.S.C.A. § 15.

On May 19, 1961 I filed a memorandum stating without opinion my holdings on these motions. This is my opinion.

Facts.

There is no genuine dispute as to the following facts.

In 1955 plaintiff Harold Silver commenced business as a broker/dealer in securities in Dallas, Texas. The business consisted almost entirely of transactions in municipal bonds. It was conducted under the name of Municipal Securities Company (Municipal). Municipal also had branch offices in Lubbock, San Antonio, Longview and Amarillo, Texas.

In 1958 Silver organized Municipal Securities Company, Inc. (Municipal, Inc.) to engage in transactions in corporate securities. Its principal business was in the over-the-counter securities market.

By February 1959 Municipal had sixteen employees and in 1958 had done a gross volume of transactions of $54,607,-000. Municipal, Inc. had seven employees and for the seven months prior to February 1959 its volume of trading in over-the-counter securities was $6,-850,000.

Both plaintiffs were licensed as securities dealers under the laws of Texas. They were also registered with the Securities and Exchange Commission as broker/dealers and both are members in good standing of the National Association of Security Dealers. They are not members of the New York Stock Exchange.

The 1,375 authorized memberships in the New York Stock Exchange (the Exchange) are held by individuals. There are also a large number of member firms, member corporations and allied members.

Member firms are partnerships transacting business as brokers or dealers in securities, at least one of whose general partners is a member of the Exchange. Member corporations are corporations engaged in the securities business which have one or more directors who are members of the Exchange. The Exchange also has an allied membership consisting of general partners in member firms or owners of voting stock in member corporations.

The Exchange lists select corporate securities which include those of many of the country's largest and most important corporations. It provides a quality market for its members to execute orders for the purchase and sale of securities so listed for their own accounts and for the accounts of customers. The Exchange also lists a few select municipal bonds.

The market price for a listed security is established by auction on the floor of the Exchange. Market prices are in a constant state of flux, many of them rapidly changing from moment to moment. The market is extremely sensitive to variations in price, even slight fluctuations causing spurts of buying and selling.

The prices of securities listed by the Exchange and traded in on its floor are supplied by continuous stock quotation service which goes by ticker to member firms, to many non-member broker/dealers and to various other places where such quotations are of interest. The ticker provides up to the minute quotations of the prices at which listed securities are being currently traded on the floor of the Exchange. The service is carried over the facilities of the Western Union Telegraph Company and is for purposes of information only.

A large number of securities are not listed either on the New York Stock Exchange or on the other national exchanges. These securities are dealt in on the so-called over-the-counter market and are known as over-the-counter securities. The market price for over-the-counter securities is established by traders at their desks in the numerous firms dealing in securities throughout the country. Such traders are in constant communication with their counterparts in other firms seeking buyers or sellers in particular securities at the best price available. There is no central trading place for over-the-counter securities. The market in them is established by the offers to buy and sell which are communicated between traders. Thus the supply and demand of the over-the-counter market establishes the going bid and asked prices for any particular security at any particular moment of the trading day.

Extensive communication networks facilitate trading in securities. The principal medium which firms engaged in the securities business use to communicate with one another is the private wire connection. This is a direct telephone wire over which traders may instantly communicate with one another to exchange information and transact business. A trader in one firm can establish contact with a trader in another simply by flipping a switch.

Depending on the number of wire connections a firm may have, a single trader in over-the-counter securities can, by using different switches on a board before him, make offers to buy or sell and obtain offers from a variety of other firms within a matter of seconds. These are direct circuits and no dialing or waiting is necessary. Thus traders have the ease and speed of immediate and direct communication. Similar communication is also carried on by direct telemeter or teletype and, in addition, some business is transacted by the more usual means of business communication.

While many dealers in over-the-counter securities are not members of the Exchange many of the member firms and corporations, including those involved here, do an extensive business in over-the-counter securities and in unlisted municipal bonds. Private wire connections between over-the-counter securities dealers, who are not members of the Exchange, and member firms, facilitate transactions between them in unlisted securities and municipals, and also provide facilities by which customers of non-member firms who desire to purchase or sell listed securities can have their orders transmitted to member firms for rapid execution.

In September 1956 direct private wires were installed between the offices of Municipal and the municipal bond departments in the Dallas offices of Merrill Lynch, Pierce, Fenner & Beane, and Rauscher, Pierce & Company, who were members of the New York Stock Exchange. In May 1958 a direct private wire was installed between Municipal and Dallas Union Securities Company, which at a later date became a member of the Exchange.

The cost of these wire connections with Rauscher, Pierce and Dallas Union was charged to Municipal by Southwestern Bell Telephone Company at $5 and $6 per month respectively.

In June 1958 Municipal, Inc. applied to the Exchange for the approval of private wire connections with the Dallas offices of the following member firms of the Exchange: Rauscher, Pierce & Company; Dallas, Rupe & Son; Eppler,

Guerin & Turner; Merrill Lynch, Pierce, Fenner & Smith; Sanders & Co.; Harris Upham & Co.; Goodbody & Co.; E. F. Hutton & Co.; Schneider, Bernet & Hickman. Each of these firms, except Merrill Lynch, Pierce, Fenner & Smith, also requested permission from the Exchange to install such private wire connections. Between June and August of 1958 the Exchange granted temporary approval for the installation of connections with all nine firms. Direct private wires were then installed at no cost to Municipal, Inc., the installation and service costs being borne by the member firms with whom the connections were maintained. A private wire connection was also installed with Dallas Union Securities Company.

In June 1958 Municipal, Inc. applied to the Exchange for the installation of its stock ticker service. The Exchange granted temporary approval and the ticker service was installed in July 1958. Municipal, Inc. was billed monthly by the Exchange for this service.

In October 1958 Municipal, Inc. made arrangements with Straus, Blosser & McDowell, a member firm of the Exchange, for a direct Western Union telemeter connection with Straus, Blosser's New York office. This connection received temporary approval by the Exchange and was installed by Straus, Blosser at its own cost.

The connection was used by both firms for obtaining quotations and transacting business in both over-the-counter and listed securities. Municipal, Inc. guaranteed a minimum of $1,000 a month in commissions on listed securities business to Straus, Blosser. The business in listed securities placed with Straus, Blosser was handled by Municipal, Inc. as an accommodation for its own customers and all commissions earned went entirely to the Straus firm.

The other member firms with whom plaintiffs maintained private wire connections also received the entire commissions on all orders for listed securities placed through them.

Thus, as of February 1959, plaintiffs had had for some time the following means of direct communication with various member firms of the Exchange: Municipal had three private wire connections with the municipal bond departments of member firms; Municipal, Inc. had ten private wire connections with the corporate securities departments of member firms, and a direct Western Union telemeter connection with Straus, Blosser in New York. Municipal, Inc. also had the Exchange's stock ticker service.

On February 12, 1959, without any notice whatsoever to either of the plaintiffs, the Exchange sent duplicate letters to eight of the ten member firms having direct wire connections with them and to Straus, Blosser with whom Municipal, Inc. had its private telemeter connection. The letters advised that temporary approval for such connections had been withdrawn and directed that such connections be discontinued at once. Merrill Lynch was advised to the same effect by telephone, and Dallas Union Securities Company received the same advice by mail on February 24, 1959. By March 2, 1959 each of the member firms had complied with this directive and had severed all private wire and telemeter connections with the plaintiffs.

On February 13, 1959 the Exchange notified Municipal, Inc. that its application for stock ticker service had been disapproved and that the temporary approval previously granted was withdrawn. Western Union Telegraph Company was directed to discontinue the service as of February 18, 1959 and did so.

The action of the Exchange requiring the discontinuance of plaintiffs' wire and telemeter connections with its member firms and the withdrawal of the ticker service, was taken pursuant to Article III, § 6, of its constitution, and its Rules 355, 356 and 358. Article III, § 6 of the constitution provides in substance that the Board of Governors of the Exchange has the power to approve or disapprove any application for ticker service to a non-member and any wire connections between any office of any member firm

or member corporation and any non-member, and may require the discontinuance of any such service or connections. Rules 355 and 356, administered by the Exchange's department of member firms, provide that no wire connections shall be established by member firms without the prior consent of the Exchange and on a form prescribed by it. They require that information concerning such arrangements be furnished periodically by member firms and provide that the Exchange may direct at any time that any means of communication which has a terminus in the office of member firms be discontinued. Rule 358 provides for applications by non-members for ticker service.

On their face the constitution and rules purport to confer upon the Exchange an absolute power to approve or disapprove all wire connections and ticker service with non-member firms and to require that such connections and services be discontinued in its absolute and uncontrolled discretion.

The Exchange gave no explanation for the action which it had taken to either the plaintiffs or to any of its member firms. Silver learned of what had occurred through a telephone call from Straus, Blosser on the morning of February 13. He immediately telephoned the Exchange for an explanation. He talked to Platow, the assistant manager of the Exchange's department of member firms, who told him in substance that the Exchange did not give reasons for disapproval or withdrawal of wire and ticker connections.

On February 16 Silver came to New York and talked to Walter Coleman of the department of member firms, who informed him that it was the firmly established policy of the Exchange not to give reasons or explanations for its disapproval of applications or its directives requiring the withdrawal of private wire connections and stock ticker service. This was the attitude of the Exchange throughout. All efforts by Silver to obtain reasons or explanations from the Exchange or an opportunity to meet any charges which had been made against

him were met with categorical refusal. Efforts on his behalf by various of the member firms affected to obtain similar information were also unavailing.

On February 26, 1959 Silver wrote to Keith Funston and Edward Werle, respectively president and chairman of the Board of Governors of the Exchange, stating:

"I feel that it is most imperative that I be advised of the reasons for the discontinuance of our wires and stock ticker service in order that we may have the opportunity to set forth our position.

"I appeal to your sense of justice and ask for the following: (1) Temporary reinstatement of the services, (2) that we be advised of the reasons for the action of the New York Stock Exchange, and (3) that we be given an opportunity to answer any charges and present whatever information you may require."

Six days later, on March 4, Funston replied:

"Dear Mr. Silver:

"Thank you for writing to me about your problem.

"While I can understand your position in wanting to know specific reasons for the recent action taken by the Exchange in connection with private wire and ticker service to your organization, I am sure you can also understand our position in declining to furnish such details.

"Before taking any such action, the Exchange always makes a very careful and very thorough investigation.

"I have personally reviewed the scope and results of such investigation in this case, and feel that the Exchange acted properly.

"Sincerely,

"G. Keith Funston"

On March 9, 1959 Werle wrote Silver to the same general effect.

At Silver's request various of the member firms with whom plaintiffs had had

connections, other securities dealers, Dallas banks and leading New York banks, wrote to the Exchange stating in substance that their business dealings with plaintiffs had been entirely satisfactory, that plaintiffs had an excellent reputation, and were considered to be responsible, of integrity and of good financial standing.[1] The position of the Exchange remained unchanged.

Plaintiffs then brought this action.

### The positions of the parties.

On their motions for partial summary judgment plaintiffs contend that there is no genuine issue of material fact as to the liability of the Exchange on their claims under the anti-trust laws and that as a matter of law they are entitled to judgment on all issues raised by that claim except those as to the damages to which they may be entitled. They seek a final determination that the defendant is liable to them under Section 4 of the Clayton Act[2] for such treble damages arising out of the acts complained of as they may be able to establish on a trial and that they are also entitled to a permanent injunction under Section 16 of the Clayton Act[3] enjoining the Exchange from interfering with the maintenance and operation of their private wire connections with member firms and from refusing to furnish Municipal, Inc. with the stock ticker service.

In essence, plaintiffs contend (1) that the conduct of the Exchange and its members in denying them private wire and telemeter connections constitutes a concerted refusal to deal with them and is thus a per se violation of Section 1 of the Sherman Act;[4] and (2) that the

[1.] The following letter from The Chase Manhattan Bank, dated March 19, 1959, is representative of letters sent to the Exchange:

"New York Stock Exchange
"11 Wall Street
"New York 5, New York
"Dear Sirs:
"It is our pleasure to write to you in behalf of the Municipal Securities Company of Dallas, Texas. While this firm is not a depositor of ours, it has been well and favorably known to us for some time.
"Our Bond Department has had transactions with the Municipal Securities Company in the form of municipal underwriting, syndicate and dealing operations which were always handled in an exemplary manner by the subject. Several of the principals are personally known to us and are considered to be men of ability and integrity.
"In short, we have a high regard for both the firm and its management, and are pleased to commend them to you as proper and responsible parties with which to have business dealings.
"Yours very truly,
"s/ John C. Senholzi
"John C. Senholzi
"Assistant Vice President"

2. 15 U.S.C.A. § 15: "Suits by persons injured; amount of recovery.
"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

3. 15 U.S.C.A. § 26: "Injunctive relief for private parties; exception
"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: * * *."

4. 15 U.S.C.A. § 1: "Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty
"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *."

discontinuance of the stock ticker service is a per se violation of Section 2 of the Sherman Act [5] since it constitutes a misuse of monopoly power which gained a competitive advantage for Exchange members over the plaintiffs in the over-the-counter securities market, and that it is also a concerted refusal to deal under Section 1.

The plaintiffs say that their private wire connections are the principal means by which over-the-counter trading is accomplished and information on prices and transactions is obtained, and that the stock ticker service is the only practicable method by which they and their customers can be kept informed of the current prices and volume on the floor of the Exchange. They say that both their wire connections and the ticker service are facilities which are necessary in order to permit them to compete effectively as securities dealers in their respective fields. They contend that the withdrawal of these connections and services placed them at a substantial competitive disadvantage vis-a-vis other security dealers, including member firms of the Exchange, and resulted in a serious loss of business. They also claim that as a direct consequence of what was done by the Exchange they were forced to expend monies in attempting to obtain substitute means of communication for those which were discontinued.

The Exchange denies any illegal conduct. It claims that as a National Stock Exchange it is a regulated industry under the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., and that it is exempt from the anti-trust laws to the extent it is so regulated. The constitution and rules of the Exchange were required to be and were filed with the Securities Exchange Commission at the time the Exchange registered with that body under the 1934 Act. Similar action was required and taken as to any rules subsequently adopted. (15 U.S.C A. § 78f.)

The Exchange urges that the acts of which the plaintiffs complain were done pursuant to its constitution and rules as duly filed with the Commission and that therefore they are outside the scope and operation of the anti-trust laws.

The Exchange contends further that even if the acts complained of are not exempt from the anti-trust laws there has not been a concerted refusal to deal in violation of such laws under the facts and circumstances of this case.

Finally, the Exchange asserts that under no circumstances can its conduct here be viewed as a per se violation of the Sherman Act. It contends that its conduct must be viewed in the light of the rule of reason and was reasonable within the meaning of that rule.

It was not until after suit was commenced that plaintiffs were able to obtain any information as to the reasons for the action taken by the Exchange. During the course of the rather extensive discovery proceedings conducted prior to making the present motions some idea of these reasons began to emerge. However, even then the basis on which the Exchange purported to have acted was not fully disclosed.

On this motion the Exchange states the following to be the reasons for the action which it took:

1. Investigation by the Exchange had disclosed certain matters derogatory to the Silvers upon which the Exchange relied but which it asserted to be confidential and refused to reveal. The Exchange has taken the position that it would not disclose such material unless so directed by the court or unless the plaintiffs were willing to execute releases undertaking not to sue the Exchange, its investigating agencies or its sources of information for libel or slander.

5. 15 U.S.C.A. § 2: "Monopolizing trade a misdemeanor; penalty

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *."

During the course of the argument of this motion before me counsel for the Exchange requested the court to receive in camera the "confidential" material relating to its investigation which he said contained "scurrilous matter with respect to the Silvers", without disclosing it to the plaintiffs. I refused to receive the material on such a basis and advised counsel that it was entirely up to the Exchange whether the material was submitted or not but that the material would not be received unless it was disclosed to the plaintiffs and the plaintiffs given an opportunity to answer it. Defendant's counsel was given time to consider further whether such material would be submitted. It has not been submitted and neither the court nor the plaintiffs know what it is claimed to contain.

2. In 1955 the Silvers had commenced to sell certain shares of the U. S. Hoffman Machinery Corporation, some two months after acquiring them. When the shares were acquired the Silvers had stated in writing that they had "no present intention" of selling them.

3. In the application of Municipal, Inc. for approval of private wire connections and stock ticker service which required a listing of all of Silver's corporate connections for a ten year period, a long list of such connections which he submitted failed to mention two corporations with which he had been connected.

4. In 1953, some six years before the wire services were discontinued, the Department of Defense had suspended the security clearance of Intercontinental Manufacturing Co., Inc. of which Silver and his wife, who was secretary-treasurer of Municipal, Inc., had been officers, directors and substantial stockholders, and also the clearances of the Silvers individually. This action was taken under the now defunct Industrial Personnel Security Program. See Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377.

The Exchange denies that its conduct placed plaintiffs at any substantial competitive disadvantage or caused them any monetary loss.

There are two distinct aspects of the controversy presented on these motions, though the complaint combines both aspects in a single claim. Each aspect constitutes a separate and distinct claim for relief based on two separate and distinct alleged anti-trust violations.

These two aspects concern, first, the withdrawal of the private wire and telemeter connections, and second, the discontinuance of the stock ticker. Each will be considered as a separate claim for relief and separately treated on the merits.

### I.

#### The private wire and telemeter connections.

##### A. The claimed exemption from the anti-trust laws.

The initial question presented for decision is whether or not, as the Exchange claims, it is exempt from the anti-trust laws by reason of the provisions of the Securities Exchange Act of 1934, and, if so, whether such exemption applies to the facts in the case at bar.

The Exchange does not claim that there is an express exemption in the statute itself, and there is none. It concedes that there is no implied over-all blanket exemption. It urges, however, that it is impliedly exempt from the anti-trust laws to the extent that it has been charged with duties and obligations by the Act. It argues that everything which the plaintiffs complain of here was done in pursuance of duties and obligations placed upon it by the Act, and that therefore it is not liable under the anti-trust laws for any of the acts complained of. In my view this position is not tenable.

Section 5 of the Securities Exchange Act, 15 U.S.C.A. § 78e, makes it unlawful to use the mails or any instrumentality of interstate commerce to effect or report any transaction in a security through the facilities of an exchange which has not registered with the Securities and Exchange Commission in compliance with Section 6 of the Act. Section 6 provides for the registration of a national securities exchange by the filing of a registra-

tion statement prescribed by the SEC and accompanied by: (1) an agreement to comply, and to enforce compliance by its members, with the provisions of the Act and the rules and regulations made thereunder; (2) data and information on organization, rules of procedure and membership; (3) "Copies of its constitution * * * and of its existing by-laws or rules or instruments * * *; and (4) An agreement to furnish to the Commission copies of any amendments to the rules of the exchange forthwith upon their adoption." Subsection (b) of Section 6 provides:

"No registration shall be granted or remain in force unless the rules of the exchange include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade, and declare that the willful violation of any provisions of this title or any rule or regulation thereunder shall be considered conduct or proceeding inconsistent with just and equitable principles of trade."

■ In substance, the purpose of the Securities Exchange Act of 1934 as expressed in Section 2 of the statute was to protect the investing public as well as the national economy and the national financial system from the injurious effects of manipulative and dishonest practices in the purchase and sale of securities.

A principal concern of Congress was the practices on the national stock exchanges which had been subject to searching congressional investigation. The report of the Senate Committee which accompanied this legislation to the floor states the basis upon which Congress concluded that regulation of the Exchanges was necessary. S.Rep. No. 792, 73d Cong., 2d Sess. (1934). The report says (pp. 4–5):

"Stock exchanges have hitherto resisted proposals for their regulation by any governmental agency, on the ground that they are sufficiently able to regulate themselves to afford protection to investors.

\* \* \* \* \* \*

"The contention of stock exchange authorities that internal regulation obviates the need for governmental control seems unsound for several reasons. In the first place, however zealously exchange authorities may supervise the business conduct of their members, the interests with which they are connected frequently conflict with the public interest. Secondly, the securities exchanges have broadened the scope of their activities to the point where they are no longer isolated institutions, but have become such an important element in the credit structure of the country that regulation, to be effective, must be integrated with the protection of our entire financial system and the national economy. Thirdly, the control exercised by stock exchange authorities is admittedly limited to their own members, and they are unable to cope with those practices of nonmembers which they deplore but cannot prevent. Fourthly, the attitude of exchange authorities toward the nature and scope of the regulation required appears to be sharply at variance with the modern conception of the extent to which the public welfare must be guarded in financial matters. Their adherence to the view that manipulation, pool activities, and the creation of illusory 'price mirages' are proper and legitimate, except where certain technical violations of their rules are involved, is inconsistent with the type of regulation the public interest demands.

"The manipulation of the so-called 'repeal stocks' on the New York Stock Exchange during the summer of 1933 illustrates the ineffectiveness of self-regulation * * *. The inability of the stock exchange authorities even to discover the flagrant abuses unearthed by the com-

mittee indicates that a Federal regulatory body could deal with such practices more effectively than the exchanges themselves."

It is thus plain that Congress had no intention of entrusting the national exchanges, which themselves required regulation, with general regulatory control over all phases of the securities business. What the exchanges were required to do was to provide machinery by which to ensure that the listed securities business which they conducted and the conduct of their membership was in accordance with law and not inconsistent with just and equitable principles of trade. Such duties and obligations as were placed upon national exchanges by the statute are limited in scope and are confined to this subject matter only.

Congress contemplated and provided for the regulation of the securities business by the Securities and Exchange Commission which was set up for that specific purpose and not by private parties.

Indeed, that is the whole scheme of the statute. The securities business is plainly not confined to the trading of securities on the floor of a particular national stock exchange, or, indeed, of national stock exchanges generally. It includes the extensive over-the-counter securities market, the whole underwriting and new issue field, and the purchases and sales of listed and unlisted securities other than on the floor of an exchange or over-the-counter.

Such regulatory power as Congress has chosen to assert over this broad field has been vested in the Securities and Exchange Commission which is charged with the burden of such regulation.

It is true that there was relatively little in the 1934 Act relating to the over-the-counter market except in terms of generality. However, the 1938 amendment to the Securities Exchange Act, 15 U.S.C.A. § 78o-3, gave the Commission broadly extended powers and functions in this area. The House Committee report to accompany this legislation indicates that the 1934 Act did not give exchanges any control over the over-the-counter securities business but limited them to their own area of the securities business. H.Rep. No. 2307, 75th Cong., 3d Sess. (1938). The report states (p. 5):

"In the Securities Exchange Act of 1934 * * * the over-the-counter markets were dealt with, in brief outline, in a single section. The brevity and generality of this treatment arose from a realistic recognition of the great difficulties of working out in any detail a suitable plan of regulation at that time, in view of the fact that so little was then known concerning these markets. But, though the Congress did not at that time have before it a sufficient record of regulation, it clearly set forth the objectives of and the standards for such regulation. Section 15, in its original form, expressly contemplated the adoption by the Securities and Exchange Commission of rules and regulations concerning the over-the-counter markets 'necessary or appropriate in the public interest * * to insure investors protection comparable to that provided by and under authority of this title in the case of national securities exchanges'. To that end, the Commission was authorized to adopt rules and regulations providing 'for the regulation of all transactions by brokers and dealers on any such market, for the registration with the Commission of dealer and/or brokers making or creating such a market, and for the registration of the securities for which they make or create a market.'"

The 1938 Act provides mechanisms of regulation of over-the-counter broker/dealers in that area of the securities business. It permits registration with the SEC of associations of broker/dealers. To obtain registration rules must be submitted to the SEC designed to prevent fraudulent and manipulative practic-

es and promote just and equitable principles of trade. Such rules must also provide that "members shall be appropriately disciplined, by expulsion, suspension, fine, censure, or any other fitting penalty, for any violation of its rules".

In contrast to the provisions regarding national exchanges, proceedings for review are available before the SEC for members of broker/dealer associations who have been disciplined, or aggrieved persons who are refused membership. The orders of the SEC entered after such proceedings are subject to review by the courts under Section 25(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78y. See, e. g., R. H. Johnson & Co. v. Securities & Exchange Commission, 2 Cir., 198 F.2d 690, certiorari denied 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664.

Moreover, in the 1938 amendment Congress expressly provided that in the event of conflict between any provision of the 1938 Act and any other provision of law, the provisions of the 1938 Act should prevail. 15 U.S.C.A. § 78o-3(n). This, of course, includes the anti-trust laws.

This again is in contrast to the provisions of the 1934 Act dealing with national stock exchanges where there is no such exemption. As Judge Medina stated with respect to the 1933 and 1934 Acts in United States v. Morgan, D.C.S.D.N.Y., 118 F.Supp. 621, 697:

"Do the provisions of the Act of 1933 and the Act of 1934 (except the Maloney Act) amount to an implied exemption, in whole or in part, from the provisions of the Sherman Act? In my opinion they do not. Where it was thought desirable and necessary to do so the Congress made specific provision for such exemption, as in Sec. 15A(n) of the Maloney Amendment to the 1934 Act, where it was thought that the Rules of Fair Practice of the NASD might run afoul of the Sherman Act.

"It must be borne in mind that this whole statutory scheme was worked out with the greatest care by members of the Congress thoroughly aware of anti-trust problems, often in close contact and cooperation with those who were later to administer the intricate phases of this well articulated and comprehensive plan of regulation of the securities business, and in possession of the fruits of many prolonged and penetrating investigations. They intended no exemption to the Sherman Act; and it is hardly probable that they would inadvertently accomplish such a result. * * *."

The Exchange argues that the scheme of the Act of 1934 was complete regulation and control of all matters relating to securities transactions and that as a registered Exchange it is therefore part of a regulated industry exempt from the anti-trust laws, at least as to all rules filed with the Commission. It is under several misconceptions.

■ In the first place "[r]egulated industries are not *per se* exempt from the Sherman Act * * *. [I]t is elementary that repeals by implication are not favored. Only a clear repugnancy between the old law and the new results in the former giving way and then only *pro tanto* to the extent of the repugnancy". State of Georgia v. Pennsylvania Railroad Co., 324 U.S. 439, 456-457, 65 S.Ct. 716, 725, 89 L.Ed. 1051. See, also, United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181; Slick Airways v. American Airlines, D.C.D.N.J., 107 F.Supp. 199; certiorari denied, 346 U.S. 806, 74 S.Ct. 54, 98 L.Ed. 336; Report of the Attorney General's National Committee to Study the Antitrust Laws, 261-262 (1955).

As I have pointed out, there is no repugnancy between the provisions of the Act of 1934 and the anti-trust laws in so far as any rules, required to be filed by a national exchange, attempt to intrude upon the over-the-counter securities market. There is not the slightest indication of congressional intent to grant any exemption from the anti-trust laws with respect to the acts with which we are concerned here.

Beyond this, it is plain that this is not a closed regulatory system which is a substitute for or supersedes the anti-trust laws. The SEC does not give affirmative sanction to the rules filed by national exchanges. Its grant of registration to an exchange goes no farther than to indicate that the rules filed meet the minimum standards required of exchanges by the statute so as to insure that its members will comply with the provisions of the law and shall not conduct themselves in a manner inconsistent with just and equitable principles of trade.

Moreover, and equally important, there is no procedure by which a non-member aggrieved by action of the Exchange purportedly taken under its filed rules, may resort to administrative proceedings before the SEC to redress his grievances or to attack the rules themselves, either at the time of filing or thereafter.

The position in which plaintiffs here find themselves illustrates this. If the theory of the Exchange were correct these plaintiffs would not only have no remedy before the Commission but would find themselves barred from remedy in the courts also on the mere say-so of a private association. This is in marked contrast to what occurs in a recognized closed regulatory system. See, e. g., Shipping Act, 46 U.S.C.A. § 801 et seq.; Interstate Commerce Act, Part I, 49 U. S.C.A. § 1 et seq.; Natural Gas Act, 15 U.S.C.A. § 717 et seq.

■ Plainly the provisions of the Act requiring an exchange to file its constitution and rules and to register are not a substitute for nor do they supersede the anti-trust laws.

The Exchange also urges that since orders and information on listed securities may be transmitted over the private wire connections with its members, it is entitled for the protection of its own business to direct that such connections with plaintiffs be severed in its sole discretion.[6] Assuming for purposes of argument, and without deciding the doubtful proposition that actions of the Exchange in prohibiting its members from using private wire connections with an individual non-member to communicate with respect to its listed securities were exempt from the anti-trust laws, there is no warrant for such an exemption with respect to transactions or information in over-the-counter securities. The Exchange may not extend whatever power it may possess over its own limited market in the securities which it lists to an entirely different phase of the securities business without being answerable for any restraints of trade which it might thus impose. There is nothing in the statute to warrant a different result.

The question we are dealing with here is not whether the acts of the Exchange were in conformity with its rules but whether or not its acts violated the anti-trust laws. It is not necessary to determine here whether some exemption from the anti-trust laws may or may not be impliedly granted to the Exchange by the provisions of the Act of 1934 if its acts directly concern the business in listed securities carried on on the floor of the Exchange. But the question here concerns an entirely different phase of the securities business, the over-the-counter and unlisted municipal markets. The Exchange is not remotely authorized or empowered by the statute to exercise any powers beyond the scope of its own business in listed securities and the ethical conduct of its own membership. It is not entitled to regulate or control conduct of

---

6. It may be noted that the definition of an Exchange "facility" in subsection 3(a) (2) of the 1934 Act, 15 U.S.C.A. § 78c (a) (2), does not include private wire connections between members and non-members. A "facility" is defined as including an exchange's " * * * premises, tangible or intangible property whether on the premises or not, any right to the use of such premises or property or *any service thereof for the purpose of effecting or reporting a transaction on an exchange* (including, among other things, any system of communication *to or from the exchange,* by ticker or otherwise, maintained by or with the consent of the exchange) * * *." [Emphasis added.]

its members which does not concern the listed securities business which the Exchange carries on in pursuance of the only purpose for which it was established.

■ Providing that its members do not indulge in conduct which is illegal or inconsistent with just and equitable principles of trade, an exchange has neither the power nor the authority to determine with whom its members may or may not deal or to direct them to desist from dealing with non-member broker/dealers engaged in transactions in over-the-counter securities and municipals. If it does so it does so at its peril and is subject to such appropriate action as may be taken under the anti-trust laws.

### B. The claimed anti-trust violations.

Since the acts of the Exchange which are the subject of this action are not exempt from the anti-trust laws, the next question is whether its acts violated these laws.

■ It is by now well settled that a concerted refusal to deal—that is to say, joint action by two or more persons in refusing to deal with another—violates Section 1 of the Sherman Act and is illegal per se. Radiant Burners v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358; Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741; Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949. See, also, Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219; United States v. Columbia Steel Co., 334 U.S. 495, 522, 68 S.Ct. 1107, 92 L.Ed. 1533.

The Exchange asserts that the acts of itself and its members in the severance of the private wire connections with the plaintiffs are not a concerted refusal to deal as that term is used in the cases.

■ The Exchange does not dispute that the severance of connections was the result of joint action between itself and its members. It concedes that the discontinuance by member firms of private wire connections with the plaintiffs was done in accordance with defendant's instructions and was not the independent act of each member.

Upon being admitted to membership in the Exchange, each member binds itself to comply with the directives issued by the Exchange pursuant to its constitution and rules. Failure to act in conformity with such instructions subjects a member to disciplinary action and possible expulsion under Section 6, Article XIV of the constitution. Each of the member firms "by entering into this combination" has "surrendered himself completely to the control of the [Exchange]" with respect to the means by which he may do business or communicate with non-members. Anderson v. Shipowners Association, 272 U.S. 359, 362, 47 S.Ct. 125, 126, 71 L.Ed. 298. As was said in that case (272 U.S. at pages 364–365, 47 S.Ct. at page 127):

"* * * it appears that each shipowner and operator in this widespread combination has surrendered his freedom of action in the matter of employing seamen and agreed to abide by the will of the associations. * * *. These shipowners and operators having thus put themselves into a situation of restraint upon their freedom to carry on interstate and foreign commerce according to their own choice and discretion, it follows * * * that the combination is in violation of the Anti-Trust Act."

The effect of this combination was to bar the member firms named as co-conspirators from exercising their freedom to carry on trade and commerce with these plaintiffs according to their own choice and discretion. They have placed restraints upon their own liberty of action and have foreclosed themselves from exercising their own independent business judgment with respect to their dealings with these plaintiffs. They are limited in such dealings by the dictates of

the combination which has substituted its business will and judgment for their own. This is one of the evils at which the Sherman Act is directed. Klor's v. Broadway-Hale Stores, supra; United States v. First National Pictures, 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151; Anderson v. Shipowners Association, supra.

Moreover, the group action which was taken resulted in the denial to these plaintiffs of the opportunity to do business with the members of the Exchange upon the same terms and conditions as others in the over-the-counter and municipal securities markets in which they were engaged. As far as the Exchange, its members and the plaintiffs are concerned there was no longer a free and untrammeled market.

Once it is shown that there was group action which produced these effects it is unnecessary to go farther. Such a concerted refusal to deal is in the forbidden category. It is a per se violation of Section 1 of the Sherman Act which is designed "to secure equality of opportunity and to protect the public against evils commonly incident to destruction of competition through monopolies and combinations in restraint of trade". Ramsay Co. v. Associated Bill Posters, 260 U.S. 501, 512, 43 S.Ct. 167, 168, 67 L.Ed. 368. In its very nature and character the action of the group interferes with the normal and natural flow of interstate commerce and the interplay of free competition therein. Section 1 of the Sherman Act forbids all combinations of such a nature.

It is not necessary to show that the combination prohibited all dealings between the member firms involved and the plaintiffs, as the Exchange seems to contend. The effect of the Exchange directive to the members of the combination was to foreclose them from dealing with the plaintiffs by means of the private wire connections which were a normal means of doing business in over-the-counter and unlisted municipal securities. The combination operated to deprive plaintiffs of a means of doing business which was of substantial value to them in the conduct of their business. The very nature of the business in which plaintiffs were engaged makes this abundantly plain. This means of doing business was available to others who did not fall within the proscription directed against plaintiffs. There were numerous other non-member broker/dealers in Dallas, and in other parts of the country, who maintained such private wire connections with member firms and continued to use them.[7]

■ "[T]he fact that an agreement to restrain trade does not inhibit competition in all of the objects of that trade cannot save it from the condemnation of the Sherman Act." Associated Press v. United States, 326 U.S. 1, 17, 65 S.Ct. 1416, 1423, 89 L.Ed. 2013. An offer to deal only under discriminatory terms or conditions is just as violative of the Sherman Act and its purposes as a refusal to deal altogether. Associated Press v. United States, supra; Klor's v. Broadway-Hale Stores, supra; United States v. First National Pictures, supra.

The Exchange urges its action cannot violate the Sherman Act since there are other means of communication with its member firms which are available to the plaintiffs. But the Exchange does not deny that the private wire connections are the fastest and most direct means of communication between traders in a business which involves rapidly fluctuating prices and where up to the minute information is of the essence. It may be that these communications are not indispensable to the conduct of the plaintiffs'

---

7. This is made abundantly clear by a letter of February 16, 1959 from Schneider, Bernet & Hickman, Inc., a member corporation, to the Exchange seeking clarification of the Exchange's order of discontinuance of the private wire connection with Municipal, Inc.:

"A direct private wire to the Municipal Securities Company, Inc. * * * is operating at the present time, *as is a private wire to most of the other members of the N.A.S.D. in Dallas.*" [Emphasis added.]

business and that they could somehow get along with substitute means of communication. But the indispensability test has long been rejected as a standard of Sherman Act violation. As the court said in the Associated Press case, supra, 326 U.S. at page 18, 65 S.Ct. at page 1424:

> "The proposed 'indispensability' test would fly in the face of the language of the Sherman Act * * *. Moreover, it would make that law a dead letter in all fields of business, a law which Congress has consistently maintained to be an essential safeguard to the kind of private competitive business economy this country has sought to maintain."

The conduct of the Exchange and its members cannot be saved by the claim that they were acting reasonably under the specific circumstances. Nor is it necessary to show that the boycott fixed or regulated prices or injured the over-the-counter and municipal securities markets generally. A concerted refusal to deal is deemed to inflict public injury of that kind by its very nature. Klor's v. Broadway-Hale Stores, supra; Fashion Originators' Guild v. Federal Trade Commission, supra.

It matters not whether the methods pursued by the combination to attain its objectives are claimed to be reasonable or justifiable under the circumstances or are for beneficial purposes. The combination cannot escape the proscriptions placed by the law upon its conduct by any showing of reasonableness or justification. The combination is per se illegal and the prohibition against it is absolute however extenuating the conditions may be which gave rise to it. As stated in Fashion Originators' Guild v. Federal Trade Commission, supra, 312 U.S. at page 468, 61 S.Ct. at page 708:

> "[T]he reasonableness of the methods pursued by the combination to accomplish its unlawful object is no more material than would be the reasonableness of the prices fixed by unlawful combination."

See, also, Anderson v. Shipowners Association, supra; Bedford Cut Stone Co. v. Journeymen Stone Cutters' Association, 274 U.S. 37, 47, 47 S.Ct. 522, 71 L. Ed. 916; Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 43, 51 S.Ct. 42, 75 L.Ed. 145; Report of the Attorney General's National Committee to Study the Antitrust Laws 133 (1955); Handler, Recent Developments In Antitrust Law: 1958–1959, 59 Col.L.Rev. 843, 862 (1959); Barber, Refusals to Deal Under the Federal Antitrust Laws, 103 U.Pa.L.Rev. 847, 875 (1955); 41 Col. L.Rev. 941 (1941).

The policy of the statute is to leave to each trader individually the determination as to whether to deal with any particular person and to forbid such a determination by group action regardless of the reasons therefor. As the court said in Fashion Originators' Guild v. Federal Trade Commission, supra, (312 U.S. at page 468, 61 S.Ct. at page 708):

> "[I]t was not error to refuse to hear the evidence offered * * *. [T]he unlawful combination [cannot] be justified upon the argument that systematic copying of dress designs is itself tortious, or should now be declared so by us. * * *. [E]ven if copying were an acknowledged tort under the law of every state, that situation would not justify petitioners in combining together to regulate and restrain interstate commerce in violation of federal law."

Thus, the contention of the Exchange that this is a case in which a rule of reason must be applied under which its conduct could be justified, is without merit. There is no room here for the application of any rule of reason for which the Exchange contends since the facts establish a concerted refusal to deal which is intrinsically unreasonable in the light of the purpose and intent of the statute.

It may be noted, however, that even if the position of the Exchange that this is a case for the application of a rule of reason were correct the Exchange would

not be exonerated here. The test which the Exchange seeks to apply is merely whether there was justification for its conduct with respect to these particular plaintiffs. It claims that its actions were based upon information showing that Silver, the sole proprietor of Municipal, and the president and sole stockholder of Municipal, Inc., and Mrs. Silver, its secretary-treasurer, were untrustworthy persons of bad repute and doubtful character and that its action in directing its member firms to discontinue the wire connections with the plaintiffs was therefore justified.

The record fails to substantiate these charges against the Silvers.

The Exchange asserts that it obtained such information as a result of investigations conducted in connection with applications of Municipal, Inc. for approval of private wire connections and for stock ticker service. The information obtained is in four different categories:

1. Certain material claimed to be of a confidential nature is said to disclose "scurrilous" information concerning Mr. and Mrs. Silver. Such material is not in this record. All that is before the court is the bare assertion that the information is "scurrilous", without a single fact to support such very serious accusations. Not only have the plaintiffs had no opportunity to rebut such undisclosed material, neither they nor the court know what it consists of.

The Exchange has taken the position that it will not make this material available to the plaintiffs unless the Silvers are willing to execute releases from any liability for defamation to the Exchange, its investigators and its so-called confidential sources, or unless the court directs its submission. Its offer to submit the material to the court in camera without disclosing it to the plaintiffs was refused. As I have previously indicated, the Exchange was given ample opportunity to place the material in the record if it so desired so that the plaintiffs might have an opportunity to answer it. The Exchange failed to do so. See supra, at page 216.

All that the court can assume in view of the position taken by the Exchange is that the material consists of dubious gossip emanating from unreliable sources and its totally unworthy of credence.

In so far as this portion of the material on which the Exchange relies to justify its conduct is concerned, the position which it has taken, far from demonstrating that it had a reasonable basis for its action, indicates the contrary.

2. The Exchange claims that the Silvers disposed of certain shares of U. S. Hoffman Machinery Corporation stock in 1955 after they had executed an agreement when they acquired the stock that it was their present intention to hold it for investment purposes and not to dispose of it. There is no merit to the claim that these facts indicate that the Silvers were untrustworthy. The SEC was fully apprised of these transactions and acquiesced in the sale without the need for a registration certificate. The material that was submitted to the SEC in justification of the sale, which is uncontroverted by the Exchange, demonstrates that the Silvers did not act in bad faith either in the statements made at the time of acquisition or in making the sales. No doubt the Exchange could readily have obtained such information from the SEC at the time of its investigation which would have refuted the charge. In any event, it could easily have been refuted by the Silvers had they been given an opportunity to do so.

3. The Exchange states that in the applications of Municipal, Inc. for approval of private wire connections and stock ticker service it failed to list all of Silver's corporate connections for a ten year period by omitting connections with the Joggler Corporation and Trans-Mar, Inc. It makes no showing that these omissions were intentional or material and Silver categorically denies that they were. There is nothing to show that there was anything wrong with these corporations or anything remotely improper in Silver's connection with them. For all that appears here, had these omissions been called to Silver's attention

he could have given the Exchange any information which it desired on the subject.

4. Finally, the Exchange relies on the fact that the security clearance of the Silvers and of Intercontinental Manufacturing Co., with which they were connected, had been suspended by the Department of Defense in 1953 under the Industrial Personnel Security Program.

In Greene v. McElroy, supra, decided in June 1959, the Supreme Court determined that the Industrial Personnel Security Program was unlawful and void. It held that since the Program afforded neither the safeguards of confrontation nor of cross-examination to those against whom proceedings were instituted it was wholly unauthorized in the absence of explicit authorization from either the President or Congress. It did not reach the constitutional question as to whether the procedures violated due process.

On August 23, 1960 the actions of the Central Industrial Personnel Security Board revoking the security clearances of the Silvers, were vacated and expunged from the records by the Department of Defense in accordance with Greene v. McElroy.

At the time the Exchange took action against the plaintiffs in February of 1959 it had before it only the bare fact that security clearances of the Silver's had been suspended. Its efforts to obtain further information from the Department of Defense were met with the reply that all the material was confidential.

Thus, in so far as appears by this record, the Exchange chose to rely upon the naked fact that the security clearances had been suspended without any information as to the nature of the charges which had been made against the Silvers more than five years before, or the grounds upon which the Department of Defense had acted.

When the Exchange acted the Industrial Personnel Security Program had already come under attack in the courts and Greene v. McElroy was decided less

than four months later. In the meantime the Exchange had denied to the plaintiffs the very right to specification of charges against them and confrontation which had been denied by the Industrial Personnel Security Board. Neither then nor thereafter when Greene v. McElroy had been decided, did the Exchange make any effort to inform the plaintiffs that the denial of security clearances was a part of the basis for its action or to give them any opportunity to make an explanation. Instead, the Exchange has consistently taken the position that the denial of security clearances was sufficient justification for its action, despite the fact that the Program has been held to be unlawful and void and the action on which the Exchange relied has been vacated and expunged from the official record.

The Exchange has placed in the record letters obtained, during pre-trial proceedings in this case, from the files of the Silvers, received by them from the Industrial Personnel Security Board at the time their clearances were suspended. These letters indicate that one of the reasons for denying security clearance was that the Board considered that the Silvers were not reliable and trustworthy. The action of the screening division was affirmed by the appeal division and by the Secretary of Defense. As the Supreme Court pointed out in Greene v. McElroy, such conclusions were reached without the right of confrontation or cross-examination and were entirely unauthorized. The defense authorities themselves have voided their own action and the procedures are no longer used.

It appears that the Exchange claims the right to adopt the same procedures with respect to the Silvers as were found to be unauthorized by the Supreme Court in the case of the Defense Department where vital national security interests were at stake. In my view the conduct of the Exchange cannot be justified by the denial of security clearance under the circumstances here disclosed, nor by any of the other facts and circumstances upon which it relied.

It may be noted that, upon deposition, Walter Coleman of the defendant's department of member firms, expressly stated that the action of the Exchange was not based on any criminal convictions of either of the Silvers, on any false or misleading statements made by them to the SEC in any application for the registration of securities, or on any specific matters regarding securities transactions other than the alleged transactions in U. S. Hoffman stock.

The inescapable conclusion from what is relied on by the Exchange in justification is that it acted arbitrarily and unreasonably in directing that plaintiffs' wire connections be severed.

### C. The right of plaintiffs to partial summary judgment.

Since I have held the conduct of the Exchange is in violation of Section 1 of the Sherman Act, the only remaining question is whether the plaintiffs are persons who are injured in their business or property by reason of such conduct under Section 4 of the Clayton Act. This the plaintiffs have clearly established.

The withdrawal of private wire and telemeter connections between the plaintiffs and the eleven member firms of the New York Stock Exchange with whom they were maintained could not fail to injure the plaintiffs' business. Such connections were available to most of the other broker/dealers who were members of the National Association of Security Dealers in Dallas.[8] The Exchange concedes that these connections were a more rapid means of communication with its members than any other. This is quite apart from the fact that the connections were installed and maintained at no cost to Municipal, Inc., and at nominal cost to Municipal. Plaintiffs have shown actual out-of-pocket expenses for substitute facilities.

Thus, under Section 4 the plaintiffs, as persons injured in their business by reason of a violation of the Sherman Act, are entitled to judgment that the Exchange is liable to them for threefold the

damages by them sustained and the cost of suit, including reasonable attorney's fee.

The question of the amount of damages and costs to which plaintiffs may be entitled raises questions of fact which cannot be determined on this motion and must be left to a trial.

It is plain that the conduct of the Exchange has continued and will continue and will cause loss and damage to these plaintiffs in the future unless enjoined by this court. Plaintiffs are therefore entitled to a decree under Section 16 of the Clayton Act permanently enjoining the defendant from preventing, prohibiting or interfering with the establishment, maintenance and operation of private wire and telemeter connections between its member firms and the plaintiffs.

### II.

#### The stock ticker service.

The claim of Municipal, Inc. that the action of the Exchange in withdrawing temporary approval of its application for the stock ticker service and discontinuing such service to it was in violation of the anti-trust laws is on a somewhat different footing from the claims with relation to the private wire connections.

The stock ticker service is supplied by the Exchange directly to those receiving it, transmitted through Western Union. Applications for the service are made directly to the Exchange and approved or disapproved by its Board of Governors. The primary attack which Municipal, Inc. makes on the action of the Exchange with respect to the stock ticker service involves alleged violation of Section 2 of the Sherman Act rather than Section 1. Municipal, Inc. asserts that the Exchange has a monopoly over the current quotations of the listed stocks traded in on its floor and over their dissemination. The denial by the Exchange of the stock ticker service to Municipal, Inc. is claimed to be a misuse of this monopoly power for the purpose of obtaining a competitive advantage for its members

8. See Note 7, supra.

in the entirely different over-the-counter securities market to the competitive disadvantage of Municipal, Inc. See United States v. Griffith, 334 U.S. 100, 68 S. Ct. 941, 92 L.Ed. 1236. See, also, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20.

Municipal, Inc. recognizes that in order to succeed on this theory it must establish that members of the Exchange obtained a competitive advantage from the action of the Exchange and that Municipal, Inc. has sustained a competitive disadvantage. It admits that there are questions of fact on this issue which are not resolved in the papers before me on this motion and which require a trial. It therefore is not entitled to partial summary judgment on this theory.

As a second string to its bow, however, Municipal, Inc. urges that the withdrawal of ticker service, like the severance of private wire connections, is the result of a concerted refusal to deal by the Exchange and its members and therefore is a per se violation of Section 1 of the Sherman Act which entitles it to partial summary judgment similar to that granted with respect to the private wire connections.

The Exchange, on the other hand, contends that the individual members and member firms of the Exchange have nothing to do with the grant or refusal of the ticker service to non-members, which is a property right of the Exchange itself. It points out that the stock ticker service goes directly from the Exchange to those subscribing to it, and that the individual members or member firms have nothing to do with the service. Members are not called upon to take any action on applications for the service. Nor have they any voice either in inaugurating the service or terminating it. They are not even notified by the Exchange when applications are filed or when they are granted.

Thus, says the Exchange, the withdrawal of the stock ticker service cannot be the result of concerted action but is the action of the Exchange alone, acting as an individual trader and not in concert with others.

The Exchange does not claim the right to apply its rules in an arbitrary or discriminatory manner. But it claims that it is entitled to take such action as it deems appropriate as an individual trader protecting its own property rights and that the group action which is required to establish a per se violation of Section 1 of the Sherman Act on the ground of concerted refusal to deal is wholly lacking here. Cf. United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505; United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S. Ct. 805, 88 L.Ed. 1024; Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307; Frey & Son v. Cudahy Packing Co., 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892; United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992.

The Exchange is a New York unincorporated association. Municipal, Inc. takes the position that the Exchange therefore can take no action as an individual trader and that any action which it takes is necessarily, by reason of the nature and character of its organization the collective action of all of its members. Municipal, Inc. argues that the withdrawal of the stock ticker service by the Exchange must have been the result of collective action since the Exchange could act in no other way. It urges, therefore, that the action of the Exchange must be a concerted refusal to deal which is a per se violation of Section 1 of the Sherman Act for the same reasons as applied to the actions of the Exchange and its members with respect to the private wire connections.

The Exchange has a property interest in its own quotations and is entitled to take reasonable measures to protect that interest. See Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750; Hunt v. New York Cotton Exchange, 205 U.S. 322, 27 S.Ct. 529, 51 L.Ed. 821; Board of Trade v. Christie Grain & Stock Co., 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031. To this extent it may have some limited exemption from the anti-trust laws with respect to the ticker service which disseminates such

quotations. I do not pass on that question here.

In my view, whether or not under the circumstances here the proprietary interest of the Exchange in the stock ticker service and the action which was taken concerning that interest was that of a single trader protecting its own property rights and thus not forbidden by Section 1 of the Sherman Act, or is the concerted refusal to deal prohibited by Section 1, should not be finally determined on the record now before me. This is a question on which no definitive authority has been called to my attention and I have found none. Cf. Sperry Products v. Association of American Railroads, 2 Cir., 132 F.2d 408, 145 A.L.R. 694, certiorari denied 319 U.S. 744, 63 S.Ct. 1031, 87 L.Ed. 1700; Chamber of Commerce v. Federal Trade Commission, 8 Cir., 13 F.2d 673; Martin v. Curran, 303 N.Y. 276, 101 N.E.2d 683; Kirkman v. Westchester Newspapers, 287 N.Y. 373, 39 N.E.2d 919; Gillette v. Allen, 269 App.Div. 441, 56 N.Y.S.2d 307. On this phase of the case it appears to me that application of the summary judgment rule is questionable and I consider it sound judicial administration to permit a trial so as to present a more solid basis for definitive findings and conclusions. Among other things, there should be a full exploration of the facts as to the nature, character and composition of the Exchange, its organization and the manner in which the Exchange takes action and took action on mattters such as this. This is in addition to the issues with respect to competitive advantage or disadvantage arising under the plaintiffs' first theory on this phase of the case. See United States v. Bethlehem Steel Corp., D.C.S.D.N.Y., 157 F.Supp. 877, 879; Kennedy v. Silas Mason Co., 334 U.S. 249, 256–257, 68 S.Ct. 1031, 92 L. Ed. 1347; 6 Moore Federal Practice 2169 (2d ed. 1953). Moreover, there must be a trial in any event on the issue of damages.

The motion of Municipal, Inc. for partial summary judgment with respect to its claim based on withdrawal of the stock ticker service will therefore be denied.

One further point remains.

In the brief memorandum of decision which I heretofore filed on these motions on May 19, 1961, I stated that while Municipal, Inc. was not entitled to partial summary judgment it had established its right to a preliminary injunction under Section 16 of the Clayton Act and Rule 65, F.R.Civ.P., restraining defendant pending the final determination of this action from refusing to make the stock ticker service available to it. In again reviewing the papers submitted by the plaintiffs in support of their motions during the preparation of this opinion I find that I overlooked the following statement at the end of their reply affidavit:

"It should be noted that plaintiff MSC, Inc. does not seek preliminary injunctive relief, but only partial summary judgment on the issue of liability and summary judgment for permanent injunctive relief.

"As I stated in my moving affidavit, MSC, Inc. has ceased to function as an operating business organization. It has no employees and retains only its corporate existence, its Texas license as a securities dealer, its broker-dealer registration with the Securities and Exchange Commission, its membership in the National Association of Securities Dealers, and certain unliquidated assets. If MSC, Inc. were to be granted a preliminary, rather than a permanent injunction, I would not and could not attempt to re-establish it as a functioning organization. First of all, employees would be unwilling to return to work on a temporary basis accorded by a preliminary decree. Secondly, as a practical matter, I could not undertake the substantial financial investment which is required to restore MSC, Inc. as an operating organization under such circumstances."

· Regardless of the merits, Municipal, Inc., by making the statement which I have quoted, has waived any rights which it might have had to a preliminary injunction and is not entitled to such relief. For this reason I withdraw that portion of my memorandum decision which stated that Municipal, Inc. was entitled to preliminary injunctive relief and such relief will be denied.

It may be noted that pursuant to 28 U.S.C. § 1292(a) the defendant may take an appeal to the Court of Appeals from that portion of the order to be entered which grants a permanent injunction against it with respect to the private wire connections. In my view the other issues determined by the order to be entered involve controlling questions of law as to which there is substantial ground for difference of opinion, and an immediate appeal on such issues also may materially advance the ultimate determination of the litigation. The order to be entered may so state pursuant to Section 1292(b).

Settle order in accordance with this opinion on seven (7) days' notice.