ARCHER et al. v. SECURITIES AND EX-
CHANGE COMMISSION.

No. 12329.

Circuit Court of Appeals, Eighth Circuit.

Feb. 15, 1943.

Rehearing Denied March 11, 1943.

796

George Reinhardt, of Kansas City, Mo., and Carl V. Rice, of Kansas City, Kan. (Frank Schibsby, of Kansas City, Mo., and William S. Hyatt, Jr., of Kansas City, Kan., on the brief), for petitioners.

Theodore L. Thau, Atty., Securities and Exchange Commission, of Washington, D. C. (John F. Davis, Sol., and Milton V. Freeman, Asst. Sol., both of Philadelphia, Pa., Abe L. Hoffman, Atty., Securities and Exchange Commission of Chicago, Ill., and Irving R. Panzer, Atty., Securities and Exchange Commission, of Philadelphia, Pa., on the brief), for respondent.

Before SANBORN, WOODROUGH, and THOMAS, Circuit Judges.

## WOODROUGH, Circuit Judge.

This case comes before the court upon the petition of W. K. Archer and Ercell G. Westfall, co-partners, doing business in Kansas City, Missouri, as W. K. Archer and Company, to review an order of the Securities and Exchange Commission entered June 13, 1942, under the Securities Exchange Act of 1934, 48 Stat. 881, 15 U.S. C.A. § 78a et seq. The Commission's order revoked petitioner's registration as a broker and dealer and expelled petitioner from the National Association of Securities Dealers, Inc., and from the Chicago Stock Exchange. Revocation of registration was ordered pursuant to Section 15(b) [1] of the Act; expulsion from the National Association of Securities Dealers and the Chicago Stock Exchange was ordered pursuant to Sections 15A(*l*)(2) [2] and 19(a)(3) [3],

[1] Section 15(b) of the Securities Exchange Act provides in part: "The Commission shall, after appropriate notice and opportunity for hearing, by order deny registration to or revoke the registration of any broker or dealer if it finds that such denial or revocation is in the public interest and that (1) such broker or dealer whether prior or subsequent to becoming such, or (2) any partner, officer, director, or branch manager of such broker or dealer (or any person occupying a similar status or performing similar functions), or any person directly or indirectly controlling or controlled by such broker or dealer, whether prior or subsequent to · becoming such, (A) has willfully made or caused to be made in any application for registration pursuant to this subsection or in any document supplemental thereto or in any proceeding before the Commission with respect to registration pursuant to this subsection any statement which was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact."

[2] Section 15A (*l*) (2) of the Securities Exchange Act provides:

"The Commission is authorized, if such action appears to it to be necessary or appropriate in the public interest or for the protection of investors or to carry out the purposes of this section—

\* \* \* \* \*

"after appropriate notice and opportunity for hearing, by order to suspend for a period not exceeding twelve months or to expel from a registered securities asso-

respectively. Proceedings were instituted May 22, 1941, by an order for Proceedings and Notice of Hearing to determine whether petitioner had wilfully violated Sections 17(a) and 5(a)(1) of the Securities Act of 1933, 48 Stat. 74, 15 U.S.C.A. § 77a et seq., and Sections 15(c)(1) and 7(c)(2) of the Securities Exchange Act of 1934, supra. A hearing was held before a trial examiner who, after taking extended evidence, filed the same and his advisory report with the Commission. The Commission considered the same, and exceptions, briefs and oral argument, and made and entered its findings and order June 13, 1942. Thereupon, pursuant to Section 25(a) of the Act, 15 U.S.C.A. § 78y(a), a petition for review was filed in this court.

It appears that W. K. Archer first entered the securities business in January, 1934, as W. K. Archer and Company, a sole proprietorship. In December, 1935, after two prosperous years in which Archer's net worth increased from about $18,000 to $42,500, the present partnership with Ercell G. Westfall was formed, ostensibly for the purpose of qualifying as a member of the Chicago Stock Exchange, the rules of which do not make individuals eligible for membership. Ercell invested no capital in the firm and has no contractual claim upon any of the firm's profits. He receives a salary of $200 per month at present and further compensation in the form of such gifts as Archer sees fit to make. The firm is licensed as a broker and dealer. Almost all of its business is as a dealer in unlisted securities in which it takes a position; that is, it buys and sells on its own account. Its trading facilities consist of a trading room equipped with telephones and teletypes and a trading desk at which the traders sit.

During the period between 1936 and 1939, Harris, Upham & Company, a brokerage house with branch offices in all parts of the United States, including one at Kansas City, Missouri, was petitioner's largest account, and the Commission found that the major portion of Harris, Upham's business in unlisted securities in its Kansas City office was transacted with W. K. Archer and Company. Most of these transactions were handled through Claude Westfall, a trader in the employ of Harris, Upham & Company until 1939, and with whom Archer had become well acquainted in previous years when himself employed in the discount and exchange department of the Missouri Savings Association Bank. Claude Westfall is the older brother of Ercell. In addition to the usual facilities of a well-equipped wire house available to him at Harris, Upham & Company, Claude also had a direct and private wire from his desk to the offices of W. K. Archer and Company.

The order here for review is rested in large part upon two of the findings made by the Commission:

1. "* * * We find that Claude Westfall, a person not named in the registrant's application for registration or any amendment thereto, was a person in control of the business. The application for registration was therefore false and materially misleading, in wilful violation of Section 15(b) of the Securities Exchange Act." [4]

ciation any member thereof who the Commission finds (A) has violated any provision of this title [chapter] or any rule or regulation thereunder, or has effected any transaction for any other person who, he had reason to believe, was violating with respect to such transaction any provision of this title [chapter] or any rule or regulation thereunder, or (B) has wilfully violated any provision of the Securities Act of 1933 [subchapter I of chapter 2A of this title], as amended, or of any rule or regulation thereunder, or has effected any transaction for any other person who, he had reason to believe, was willfully violating with respect to such transaction any provision of such Act [subchapter] or rule or regulation."

3 Section 19(a) (3) of the Securities Exchange Act provides:

"The Commission is authorized, if in its opinion such action is necessary or appropriate for the protection of investors—

 * * * * *

"After appropriate notice and opportunity for hearing, by order to suspend for a period not exceeding twelve months or to expel from a national securities exchange any member or officer thereof whom the Commission finds has violated any provision of this title [chapter] or the rules and regulations thereunder, or has effected any transaction for any other person who, he has reason to believe, is violating in respect of such transaction any provision of this title [chapter] or the rules and regulations thereunder."

4 Section 15(b) provides, in part: "A broker or dealer may be registered for the purposes of this section by filing with the Commission an application for registration, which shall contain such information in such detail as to such broker or

2. " * * * We find that the registrant, in conjunction with Westfall, but unknown to Harris, Upham & Company, defrauded the latter's customers over a period of at least two years in violation of Section 17(a) of the Securities Act, Section 15(c) (1) of the Securities Exchange Act, and Rule X–15C1–2 promulgated thereunder." [5]

It is petitioner's position upon this review that the Commission's findings are not supported by substantial evidence in that the evidence is purely circumstantial, based upon uncorroborated hearsay and the statements of witnesses the credibility of whose testimony had been destroyed upon cross-examination. This claim has been urged upon us both in the very elaborate and forceful briefs and upon oral argument, and we are not unmindful of its importance in view of the severity of the order before us, which, if sustained, strikes directly at this petitioner's present means of livelihood. Such considerations have impelled a most careful and searching study of the record.

### The Issue of Control of Petitioner by Claude Westfall.

The Commission's findings that Claude Westfall was a person in control of the business of W. K. Archer and Company was based to a great extent upon the testimony of Eldridge Robinson and Hayward Hunter who were employed by Archer and Company in the important and close relationship of traders for the company.

Robinson testified that Claude Westfall had told him in Archer's presence that he was a partner in the company. He also stated that Claude had once told him that he had contributed $500 in the original capitalization of the company. Both of the traders testified that Claude performed managerial functions for the firm. There were various meetings in the homes of Archer, Westfall and Hunter in which discussions were had as to how to get more business. During business hours Westfall often by telephone approved transactions or gave instructions. This testimony is corroborated by written instructions to traders of W. K. Archer and Company made in Claude Westfall's handwriting upon National Daily Quotation Service sheets, a private service setting forth prices listed by dealers upon various indicated securities. There was also testimony that Claude Westfall had on occasions purchased from or sold securities to petitioner on be-

---

dealer and any person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such broker or dealer, as the Commission may by rules and regulations require as necessary or appropriate in the public interest or for the protection of investors."

[5] Section 17(a) of the Securities Act provides:

"It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

Section 15(c) (1) of the Securities Exchange Act provides: "No broker or dealer shall make use of the mails or of any means or instrumentality of inter-

state commerce to effect any transaction in, or to induce the purchase or sale of, any security (other than commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange, by means of any manipulative, deceptive, or other fraudulent device or contrivance. The Commission shall, for the purposes of this subsection, by rules and regulations define such devices or contrivances as are manipulative, deceptive, or otherwise fraudulent."

Rule X–15C1-2 provides:

"(a) The term 'manipulative, deceptive, or other fraudulent device or contrivance,' as used in Section 15(c) (1) of the Act, is hereby defined to include any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

"(b) The term 'manipulative, deceptive, or other fraudulent device or contrivance,' as used in Section 15(c) (1) of the Act, is hereby defined to include any untrue statement of a material fact and any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made, not misleading which statement or omission is made with knowledge or reasonable grounds to believe that it is untrue or misleading."

half of Harris, Upham & Company without petitioner having made a previous offer to purchase or sell that security. Robinson and Hunter also stated that while they had been hired by Archer, it was Claude Westfall who accepted their resignations from their employment with the company.

It was established that Claude beneficially owned ten trading accounts in W. K. Archer and Company, carried in ten different names. The existence of these accounts without the knowledge and consent of Harris, Upham & Company, Westfall's employer, was itself a violation of Rule 13 of the Chicago Stock Exchange. It was through these accounts that Westfall is found to have received part of his compensation. A number of instances are shown where securities were received into these accounts for which Westfall paid nothing and which he later sold for cash. It also appears in the record that Claude Westfall on several occasions received cash from his brother Ercell.

In rebuttal of the evidence of Westfall's control of W. K. Archer and Company petitioner attacked the credibility of Robinson's testimony by attempting to show that he was a disgruntled former employee who had been guilty of defalcation in a previous employment for which his bondsman had been obliged to make good, but which he had denied under oath upon applications to the State Securities Commission of Missouri for registration as a salesman. However, further questioning revealed that no defalcation had actually occurred but that the incident concerned a debt which Robinson was unable at the time to pay. Documentary evidence was introduced purporting to account for all of Archer's available funds and intended to demonstrate that nothing was available with which Archer could have made any substantial divisions with Westfall. To this was added the testimony of W. K. Archer and numerous employees and former employees, the gist of which was to deny the evidence introduced in support of the charges.

We have carefully examined the evidence in the record. That examination has revealed much conflicting evidence on most of the issues. But where a proceeding is had before an administrative fact-finding body, it is the function of that body to resolve the conflicts of evidence taken before it and not of the court before which the findings are brought for review. Theirs is the function of appraising conflicting as well as circumstantial evidence and theirs is the duty of determining the weight and credibility to be given to all the testimony. National Labor Relations Board v. Link Belt Company, 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368. By Section 25 (a) of the Act, 15 U.S.C.A. § 78v(a), "the finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." This means only that upon review to the courts the findings of fact must be sustained if supported by substantial evidence and those findings can not be set aside simply because different inferences may be drawn from the evidence. National Labor Relations Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305. That there must be substantial evidence does not require that there be proof beyond a reasonable doubt, Wright v. Securities and Exchange Commission, 2 Cir., 112 F.2d 89, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Company v. National Labor Relations Board, 305 U. S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126.

The question whether or not Westfall had a control in W. K. Archer and Company was a question of fact to be determined by the Commission. We have been unable to find any arbitrary or flagrant disregard by the Commission of evidence before it. Some of the evidence, it is true, would, in an action at law, fall within the category of hearsay. But the Commission is not bound by the strict common law rules as to the reception and consideration of such evidence. Moreover, it found support for its findings in documentary evidence taken from petitioner's own books which it deemed corroborative of the testimony of Robinson and Hunter. We think that there is substantial competent evidence in the record to support the Commission's conclusion that Claude Westfall had a control of W. K. Archer and Company and that petitioner's application for registration which stated that Archer and Ercell Westfall were the only persons who controlled the business was false and constituted a violation of Section 15(b).

### The Issue of Fraud.

The Commission found that for over a period of at least two years the petitioner in conjunction with Claude Westfall[6] defraud-

---

[6] Claude Westfall, though subpoenaed by both sides, did not appear or testify.

ed the customers of Harris, Upham & Co., by effecting over-the-counter trades in securities at prices deviating from the prevailing market prices which was violative of Section 17(a) of the Securities Act, Section 15(c) (1) of the Securities Exchange Act and Rule X–15C1–2.

The general scheme as outlined by the testimony of the two traders for the petitioner, Robinson and Hunter, was that securities of Harris, Upham & Company's customers were sold to Archer and Company under the market while sales were made to Harris, Upham & Company's customers at prices above the market. An example found by the Commission as typical was a transaction in November, 1937, in Woolf Brothers preferred stock. Harris, Upham & Company, acting as broker for a customer, confirmed to Archer through Westfall a sale of 25 shares at 87. At the same time a purchaser was named who would offer 93. Archer and Company sold the stock to that purchaser at that price. That Westfall knew that a price of 93 could be obtained is corroborated by the witness Carroll, trader for Prescott, Wright, Snider Company, the purchaser, who testified that he had made a bid of 93 to Westfall. Petitioner's witnesses testified only that they could not remember the transaction.

The Commission's attention was directed particularly to a list of 43 trades going in and out on the same day selected by the accountant-investigator for the Commission from his examination of petitioner's books. He testified that he selected only a sufficient number of such trades "to show a continuation of that method" and that he noticed "several hundred" similar trades. However, it was only the selected 43 which he checked against the prevailing market prices to show a discrepancy in Archer's favor.

Petitioner contends that evidence that some transactions were made at prices more advantageous to it than the prevailing market price is not evidence of any collusion between Archer and Company and Westfall for the reason that in all the transactions Harris, Upham & Company through Westfall was acting as agent for petitioner. It is argued that these were simply transactions by a securities broker as agent for a securities dealer and that as broker Harris, Upham owed to petitioner the duty of getting the best prices available and of advising from time to time what profitable transactions could be made. In support of its position petitioner relies principally upon recitations in Harris, Upham's "order slips" and "comfirmation slips." The order slips employ the words "bought for" or "sold for W. K. Archer & Co." The confirmation slips read: "This transaction was consummated by us as broker for both buyer and seller." It was urged upon the Commission and now upon us that this is convincing evidence of a principal-agency relationship in which Archer was the principal and Harris, Upham the agent, and that the transactions in question originated in all cases with the petitioner, thus devolving upon Westfall the duty of obtaining for Archer and Company the most favorable transaction possible.

There are, however, other considerations which militate against petitioner's contention. It is admitted that all order slips for these transactions were made out by Harris, Upham's trader, Westfall himself. It was, therefore, in his power, if he so chose, to cast the transactions into an agency form regardless of their true nature. The confirmation slips were made out by others whose only knowledge of the transaction was derived from the order slips. The confirmation could, then, only reflect the recitations in the order slips. It is also to be noted that in most of the deals in question petitioner paid no commissions to Harris, Upham and Company. It is true that the payor of the commission in brokerage transactions is not in all cases the one at whose instance the transaction originated. However, as was stated by Harris, Upham's Kansas City office manager, where there is payment of commission on one side of the transaction and the transaction is net on the other side, it is a strong indication that the commission side is the originating side.

■ The evidence on the whole does not warrant a conclusion that there was such an agency relation on the part of Harris, Upham towards petitioner as to preclude the finding that there was collusion between it and Claude Westfall in effecting trades at prices not in line with the market for petitioner's benefit. Petitioner's traders, Robinson and Hunter, who were in position to know of their own knowledge, said that there was such collusion, and the testimony of the examiner and the records was probative and corroborative. The Commission's finding is sufficiently supported.

In addition to its general finding that petitioner and Claude Westfall had engaged in a scheme to defraud customers in violation of the above-mentioned provisions of the Act, the Commission made findings of guilt in respect to three specific transactions which we will again consider here.

(1) Pacific States Savings and Loan Association Certificates.

The facts surrounding this transaction as found by the Commission were to the effect that in April, 1937, the Citizens National Bank of Fort Scott, Kansas, on behalf of one of its depositors, requested Harris, Upham to sell as its agent some Pacific States Savings and Loan Association certificates of the face amount of about $19,160. Claude Westfall sold and delivered the certificates to Archer and Company at 79 net. However, the Association was at that time engaged in litigation affecting the transferability of the certificates and payment was not made. In May, the bank asked that the transaction be cancelled and the certificates returned. In September Archer received an offer of 80 for the certificates and he immediately gave Westfall a bid of 75, which was relayed to the bank. It in turn sent the certificates to Harris, Upham. Harris, Upham's records do not show any receipt of these securities nor any sale to Archer. Nevertheless, petitioner somehow received the certificates and purchased them in the name of American Loan and Investment Company, a "dummy" corporation. Archer and Company then sent a letter to the bank stating, "Sold the above mentioned for you * * * and enclose herewith check in the amount of $14,371.88". On the same day petitioner sold the certificates at 91½ net, realizing a profit of $3,161.81. There is evidence that Claude Westfall received half of this profit.

Petitioner contends that since it had no prior negotiation with the bank, it acted not as agent but as principal in the matter and therefore violated no fiduciary duty in confirming the sale at a price so at variance with the ultimate selling price. The Commission, however, found that petitioner's letter of confirmation stating "sold for you" was an agency confirmation, intended and treated as such, and that Archer and Company can not be heard to repudiate its own description of its capacity.

Moreover, that even admitting Archer was not acting as agent, still, when it was known that Westfall was acting as the bank's agent Archer acted in conjunction with Westfall and shared the profits with him and he could not absolve himself of Westfall's failure to act for the best interests of the bank. Thus in either case petitioner was defrauding the bank in violation of Section 17(a) of the Securities Act, Section 15(c) (1) of the Securities Exchange Act, and Rule X–15C1–2. We think there is substantial evidence in the record to support the Commission's finding.

(2) United Securities Transaction.

The facts surrounding this transaction were found by the Commission as follows:

"On May 11, 1939, the registrant was asked by a customer who wished to sell for a quotation on 100 shares of United Securities of Missouri preferred. The registrant replied that there was 'a very thin market' for this stock and 'it will take a firm offering of several days in order for * * * [it] to be sold' but added that 'United Securities of Missouri preferred are quoted at 46 bid.' The stock was commonly sold in units consisting of one share of preferred and one-half share of common stock. On May 19, the registrant received a firm offer from this customer to be kept open until June 1, for the sale of 100 units at 46; and on May 22, it replied: 'We are contacting several of our clients in an effort to dispose of this stock for you.' On the same day the registrant, in seeking to promote a sale of this security to one of its customers, quoted the preferred stock as 60 bid, 68 asked, and the common stock as 5 bid, 7 asked; on May 29, the respondent sold the preferred stock to another customer at 60 [7] and immediately confirmed the purchase of 100 units from its earlier inquirer at 46.

"The record discloses that respondent had effected four transactions in this security during the two months prior to its representation to the selling customer, at prices ranging from 50 to 55, and that three days before this representation was made, it had executed a sale at 50. The record also discloses that although the registrant had informed its inquirer that the price was 46, within seven days it sent to a potential purchasing customer a telegram reading: 'United Securities pre-

---

[7] "Subsequently, on June 1, the price was adjusted downward to 58."

ferred 60 bid, 68 asked. Common 5 bid, 7 asked. Advise interest.' "[8]

Petitioner pleads its good faith in this transaction and that it misrepresented nothing. It is urged that in none of the correspondence did it imply that a market existed and that by the quotation of 46 was meant only that it was willing to do business at that price. The Commission, however, found that while in fact no market existed in these securities, petitioner represented to its customer that a market did exist (though a thin one), and that the statement that the quoted price was 46 was a wilful misrepresentation as to the price at which the securities were being freely traded and that such misrepresentation was in violation of Section 17(a) of the Securities Act, Section 15(c) (1) of the Securities Exchange Act and Rule X–15C1–2. In view of the immediately prior trades of petitioner in these securities and its subsequent quotation to a prospective purchaser, we believe there was substantial evidence to support the Commission's finding.

(3) The Dewey Portland Cement Transaction.

The Commission's finding on this transaction is as follows:

"On October 19, 1937, the registrant purchased from a dealer at 23½ and sold to a customer at 24½, 100 shares of Dewey Portland Cement common stock. Registrant's expected profit on the purchase and sale was $75. The dealer, however, was unable to deliver, and, after repeated requests for delivery, finally asked Archer, on November 15, to 'Please "buy in" the stock and advise us of the cost of the same.' Archer replied on November 17, stating, 'We are endeavoring to fill your order.' On November 18, registrant's customer cancelled the trade without loss or

added expense to the registrant, and on the same day the latter represented to the dealer that he was unable to find any stock in the local market at any price and that 'our customer * * * instructed us that he would take 26½ for his stock.' Later that day, the respondent wrote to the dealer stating that ' * * * we have secured an adjustment with our client entailing a $300 cash settlement,' and requesting payment of that amount. On November 20, the dealer sent a check for that amount to the respondent.

"We find that in the transaction the registrant has wilfully violated Section 15(c) (1) of the Securities Exchange Act and Rule X–15C1–2 promulgated thereunder. Moreover, we find that although there was an attempt to obscure the substance of this transaction on the registrant's books, it ultimately resulted in a gain of $225 in one of the accounts of Claude Westfall."

The facts are not controverted. Petitioner contends, however, that its letter to the dealer informing him that a $300 cash settlement had been made and requesting payment was only "sales talk" designed to encourage the dealer to pay an obligation it legally owed. We think the evidence sufficiently sustains the Commission's finding.

### Violations of Section 7 (c) (2).

■ The Commission also found that petitioner had on several occasions improperly extended credit in violation of Section 7(c) (2) [9] of the Securities Exchange Act and Regulation T thereunder. Petitioner admits the violations but insists that they were inconsequential since they occurred in accounts of members of the partnership or Mrs. Archer. This finding has not on this appeal been strenuously defended or contested, but the Commission was not per-

[8] "We note, too, that although Archer's transaction with its selling customer at 46 included the sale of the common stock, the other transaction involved only the sale of the preferred stock."

[9] Section 7(c) (2) provides:

"It shall be unlawful for any member of a national securities exchange or any broker or dealer who transacts a business in securities through the medium of any such member directly or indirectly to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer * * *

"(2) Without collateral or on any collateral other than exempted securities and/or securities registered upon a na-

tional securities exchange, except in accordance with such rules and regulations as the Federal Reserve Board may prescribe (A) to permit under specified conditions and for a limited period any such member, broker, or dealer to maintain a credit initially extended in conformity with the rules and regulations of the Federal Reserve Board, and (B) to permit the extension or maintenance of credit in cases where the extension or maintenance of credit is not for the purpose of purchasing or carrying securities or of evading or circumventing the provisions of paragraph (1) of this subsection."

suaded that these practices should be dismissed as trivia, and considered it together with the evidence of fraudulent transactions and practices in arriving at its conclusion that it was in the public interest to issue its order of revocation and expulsion. We do not find that the view taken was erroneous.

As stated previously in this opinion, we have given the evidence on each issue before us careful examination, and have been helped to an understanding of the unfamiliar specialized transactions by the unremitting labor of earnest counsel reflected in the briefs. It is not our province to determine whether, if this evidence had been before us in the first instance, we would have arrived at findings and conclusions at variance with those reached by the Commission. On no issue have we found any indication of arbitrary or capricious action by the Commission. On the contrary, we have found supporting evidence for each finding.

Petitioner has urged upon us its plea that it has been rendering a respectable and valuable service to its community during the course of its years of business operation. It has presented evidence of its hundreds of transactions upon which no shadow of guilt can be cast. It is further stressed that petitioner was unfairly called upon to explain records of isolated transactions, so long passed that they had faded from memory, and it is true that the charges and much of the testimony related to dealings that had long been closed. But the relationship between petitioner and Claude Westfall, the trader for Harris, Upham & Company, was continuing, and the existence of that relationship tended to connect a great many transactions which otherwise might, as petitioner contends, have been thought to be "isolated." The layman is amazed rather at the completeness with which the dealings are revived and disclosed than by any fading from memory. The matters which Mr. Archer and his partner could not remember were not conspicuously those of earlier dates.

 The business of trading in securities is one in which opportunities for dishonesty are of constant recurrence and ever present. It engages acute, active minds, trained to quick apprehension, decision and action. The Congress has seen fit to regulate this business. Though such regulation must be done in strict subordination to constitutional and lawful safeguards of individual rights, it is to be enforced notwithstanding the frauds to be suppressed may take on more subtle and involved forms than those in which dishonesty manifests itself in cruder and less specialized activities. Archer's two associates, Robinson and Hunter, who carried on many of the questioned transactions in intimate collaboration with him and Westfall in their employment day in and day out over a course of years, stood firm on their testimony that the business was done dishonestly, and there could be no question of mere mistake or faulty memory on their part in that matter. Bitterness of attack and some flaws in the testimony of each respecting details, pointed out and considered, can not expunge what they disclosed of their own knowledge. The testimony against petitioner remains substantial.

The grounds of the complaint against the severity of the Commission's order have been considered, but the Commission has acted in that respect within the power conferred upon it by Congress.

The order of the Commission is affirmed.