Harold **J.** SILVER, doing business as Municipal Securities Company, and Municipal Securities Company, Inc., Plaintiffs-Appellees,

v.

NEW YORK STOCK EXCHANGE,
Defendant-Appellant.

No. 208, Docket 27211.

United States Court of Appeals
Second Circuit.

Argued Feb. 7, 1962.

Decided April 6, 1962.

A. Donald MacKinnon, of Milbank, Tweed, Hope & Hadley, New York City (Edward J. Reilly, Jr., Squire N. Bozorth, New York City, on the brief), for defendant-appellant.

David I. Shapiro, of Dickstein, Shapiro & Galligan, New York City (Goldberg, Fonville, Gump & Strauss, Dallas, Tex., on the brief), for plaintiffs-appellees.

Peter A. Dammann, Gen. Counsel, S. E. C., Washington, D. C. (David Ferber, Associate Gen. Counsel, Walter P. North, Asst. Gen. Counsel, Faith Colish, Washington, D. C., Atty., S. E. C., on the brief), for Securities and Exchange Commission, amicus curiae.

Before LUMBARD, Chief Judge, and WATERMAN and HAYS, Circuit Judges

HAYS, Circuit Judge.

This is an action for damages and injunctive relief brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C.A. §§ 15, 26. The principal issue is whether defendant by instructing its members to deny private wire service to the plaintiffs engaged in an activity prohibited by Section 1 of the Sherman Act, 15 U.S.C.A. § 1. The lower court, granting plaintiff's motion for summary judgment, held that defendant's action constituted a concerted refusal to deal which was *per se* unlawful, and gave plaintiff a permanent injunction. 196 F.Supp. 209 (S.D.N.Y. 1961). This is the order from which the present appeal is taken. We reverse on the ground that the defendant acted in pursuance of powers granted to it by the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq.

The plaintiffs, Municipal Securities and Municipal Securities, Inc. are engaged in the securities business in Dallas, Texas. Municipal Securities deals almost exclusively in municipal bonds, Municipal Securities, Inc. in over-the-counter corporate securities. They are not members of the New York Stock Exchange. Harold J. Silver was, until his death, sole proprietor of Municipal Securities. He and his wife were the principal officers and directors of Municipal Securities, Inc.

In June, 1958, Municipal Securities, Inc. applied to the New York Stock Exchange for approval of private wire con-

nections[1] with several offices of firms which were members of the Exchange.[2] The Exchange gave "temporary approval" to the proposed arrangement and the connections were installed.

Following its usual practice in such cases the Exchange ordered an investigation of Municipal Securities, Inc. and its officers. The investigation revealed several matters which appeared to the Exchange to have a bearing on whether approval of the application of Municipal Securities, Inc. should be made permanent. According to the Exchange, plaintiff Silver, in providing the information requested by the Exchange in connection with his application, had failed to list two corporations with which he and his wife had been connected, the Defense Department had suspended the security clearance of Silver and his wife and of another corporation in which the Silvers held a major interest, the Silvers had "apparently" breached an agreement involving the exchange of certain shares of stock, and there were "further disclosures of a derogatory nature."

On February 12, 1959, relying upon the results of its investigation and without notice to Municipal Securities, Inc., the Exchange "requested" its members to discontinue the private wire connections with Municipal Securities, Inc. They did so.

The results of the investigation were disclosed only in the course of the proceedings in the lower court, and, then, according to the Exchange, only in part. Silver's attempts to learn from the Exchange the reasons for the cancellation of the wire services were unavailing. He was informed that the practice of the Exchange did not permit the disclosure of this information.

The lower court held that the action of the Exchange and its members constituted a concerted refusal to deal which violated Section 1 of the Sherman Act and was illegal *per se*.

It is quite clear that there would be, at the very least, a grave doubt as to the legality of the action of the defendant if it is not insulated from liability under the Sherman Act for such action by reason of the duties and obligations imposed upon it by the Securities Exchange Act of 1934. We hold, however, that the action of the Exchange in bringing about the cancellation of the private wire connections with members of the Exchange was within the general scope of the authority of the Exchange as defined by the 1934 Act and therefore outside the coverage of the Sherman Act.

The broad scope of the Securities Exchange Act is indicated by Section 2, Necessity for Regulation, which reads in part as follows:

> "transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto, * * * and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets in such transactions."

The basic scheme of the Act contemplates that control over the conduct of members of securities exchanges will be shared by the Securities and Exchange Commission and the securities exchanges themselves, with the Commission exercising general supervisory power over the exchanges' self-regulation. The report on stock exchange regulation by the so-called Dickinson Committee which, at the request of the President and in collabora-

---

1. Private wires, as used here, means direct telephone and telemeter connections.

2. Municipal Securities, without applying for such approval, had at an earlier date established private wire connections with other member firms.

tion with the Senate Committee on Banking and Currency, formulated the fundamental plan for the legislation in this field, stated:

> "It is not proposed that the Government so dominate exchanges as to deprive these organizations of initiative and responsibility * * [We propose the formation of] a Government agency operating in this field, and endowed with wide powers to license or close exchanges, coupled with the reserve power to license individual brokers * * *, and to make rules and regulations concerning a delicate mechanism like the stock exchange [which] must be * * * so constituted as to place responsibility to the fullest extent possible on the private bodies now handling the work of security exchanges."

> "[I]t seems distinctly better, in the opinion of your committee, to stimulate the exchange to further disciplinary activity by holding it to a high degree of accountability for the conduct of [its] members." [3]

The House Committee Report on the bill which became the 1934 Act said:

> "It is hoped that the effect of the bill will be to give to the well-managed exchanges that power necessary to enable them to effect themselves needed reforms and that the occasion for direct action by the Commission will not arise." [4]

The Senate Committee Report said:

> "Thus the initiative and responsibility for promulgating regulations pertaining to the administration of their ordinary affairs remain with the exchanges themselves. It is only where they fail adequately to provide protection to investors that the Commission is authorized to step in and compel them to do so." [5]

The structure of the Act bears out this purpose. Section 6(a) requires an exchange upon registering with the Commission to file a registration statement containing "an agreement * * * to comply, and to enforce so far as it is within its powers compliance by its members, with the provisions of" the Act and the Commission's rules and regulations thereunder. Section 6(a) (3) requires the filing with the Commission of copies of the constitution of the Exchange, and its rules. The Exchange must provide "an agreement to furnish to the Commission copies of any amendments to the rules of the Exchange forthwith upon their adoption." (Section 6(a) (4)). The rules of the Exchange must "include provision for the expulsion, suspension or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade," and must be "just and adequate to insure fair dealing and protect investors." (Section 6 (c, d).)

Under Section 19 the Commission is authorized "if in its opinion such action is necessary or appropriate for the protection of investors—

> "(1) After appropriate notice and opportunity for hearing, by order to suspend for a period not exceeding twelve months or to withdraw the registration of a national securities exchange if the Commission finds that such exchange has violated any provision of this chapter or of the rules and regulations thereunder or has failed to enforce, so far as is within its power, compliance therewith by a member or by an issuer of a security registered thereon."

---

3. Stock Exchange Regulation—Letter of Transmittal from the President of the United States to the Chairman of the Committee on Banking and Currency with an Accompanying Report Relative to Stock Exchange Regulation, Senate Committee Print, 73rd Cong., 2d Sess. (1934) pp. 6, 7, 8.

4. H.R.Rep. No. 1383, 73rd Cong., 2d Sess. 15 (1934).

5. S.Rep. No. 792, 73rd Cong., 2d Sess. 13 (1934).

Section 19(b) provides:

"The Commission is further authorized, if after making appropriate request in writing to a national securities exchange that such exchange effect on its own behalf specified changes in its rules and practices, and after appropriate notice and opportunity for hearing, the Commission determines that such exchange has not made the changes so requested, and that such changes are necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange or to insure fair administration of such exchange, by rules or regulations or by order to alter or supplement the rules of such exchange (insofar as necessary or appropriate to effect such changes) in respect of such matters as (1) safeguards in respect of the financial responsibility of members and adequate provision against the evasion of financial responsibility through the use of corporate forms or special partnerships; (2) the limitation or prohibition of the registration or trading in any security within a specified period after the issuance or primary distribution thereof; (3) the listing or striking from listing of any security; (4) hours of trading; (5) the manner, method, and place of soliciting business; (6) fictitious or numbered accounts; (7) the time and method of making settlements, payments, and deliveries and of closing accounts; (8) the reporting of transactions on the exchange and upon tickers maintained by or with the consent of the exchange, including the method of reporting short sales, stopped sales, sales of securities of issuers in default, bankruptcy or receivership, and sales involving other special circumstances; (9) the fixing of reasonable rates of commission, interest, listing, and other charges; (10) minimum units of trading; (11) odd-lot purchases and sales; (12) minimum deposits on margin accounts; and (13) similar matters."

In accordance with the requirements of the Act, the constitution and rules of the defendant New York Stock Exchange were filed with the Commission. Article III, Section 6, of the constitution provides that the Board of Governors of the Exchange "shall have supervision over all matters relating to the collection, dissemination and use of quotations and of reports of prices on the Exchange and shall have the power to approve or disapprove any application for ticker service to any non-member, or for wire, wireless, or other connection between any office of any member of the Exchange, member firm or member corporation and any non-member, and may require the discontinuance of any such service or connection."

Rules 355 and 356 as they read in 1958 provided:

"Rule 355. (a) No member or member organization shall establish or maintain any wire connection, private radio, television or wireless sytem between his or its offices and the office of any non-member, or permit any private radio or television system between his or its offices, without prior consent of the Exchange.

"(b) Every non-member will be required to execute a private wire contract in form prescribed by the Exchange to be filed with it, unless a contract is already on file with the Exchange.

"(c) Notification regarding a private means of communication with a non-member and the signed contract when necessary shall be submitted to the Department of Member Firms. This notification, by a member or allied member, may be in form supplied by the Exchange or in letter form, and shall include the essential facts concerning the non-member and the means of communication.

"(d) Each member or member organization shall submit annually to the Department of Member Firms a list of all non-members with whom private means of communication are maintained.

"(e) The Exchange may require at any time that any means of communication be discontinued.

Rule 356. The Exchange may require at any time the discontinuance of any means of communication whatsoever which has a terminus in the office of a member or member organization. * * * "

As Judge Clark said in Baird v. Franklin, 141 F.2d 238, 244 (2d Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), the Act makes it the duty of the Exchange to enforce the rules which it is required to file with the Commission.

"There can be no doubt that § 6 (b) places a duty upon the Stock Exchange to enforce the rules and regulations prescribed by that section. Any other construction would render the provision meaningless. Defendant's argument that the Securities Exchange Act did not alter the prior status of the Stock Exchange Rules as by-laws of a private club is untenable. If all that § 6(b) meant was that every exchange should pass token regulations, incapable of enforcement except at the wish of the exchange itself, there would have been no purpose for its inclusion in the Act. Sections 6(b) and (d) were surely intended to be read together, and the latter makes it clear that the purpose of the requirements of the former is 'to insure fair dealing and to protect investors.' This can be realized only if § 6(b) is construed as imposing the twofold duty upon an exchange of enacting certain rules and regulations and of seeing that they are enforced." [6]

See also 2 Loss, Securities Regulation 1178 (1961).

■■ To summarize: The structure of the Securities Exchange Act of 1934 and its legislative history disclose that the Act was designed to require that the Securities and Exchange Commission share with the exchanges themselves the governance of those matters which the Act regulates. The constitution and rules of the New York Stock Exchange are filed with the Commission. It is reasonably to be presumed that those regulations have the approval of the Commission since it has not taken the action which it is empowered by the statute to take to bring about their amendment. The Exchange is required by virtue of the statute to enforce its rules. As long as the Exchange acts within the scope of its statutory authority in the enforcement of its rules its action cannot be condemned as within the prohibitions of the Sherman Act.

But, it is argued, and the lower court held, that the Exchange exceeded its authority in the present case in acting with respect to dealings in over-the-counter securities. It may be, it is said, that the Exchange is free from the restrictions of the anti-trust laws so long as it confines its activity to matters which relate to securities which are listed on the Exchange; but when it goes beyond these limits and purports to exercise authority over dealers in the over-the-counter market it subjects itself to a charge of violation of the Sherman Act.

There is no justification in the Securities Exchange Act for drawing a distinction between the control which the Exchange is called upon to exercise over its members when they are dealing with listed securities and when they are dealing with other securities. On the contrary there are a number of references in the Act to activities connected with unlisted securities or with "any" securities (see e. g. Section 7(c) (2), Section 8(c), Section 10(b)).

---

6. While Judge Clark dissented on another issue, his statement on this point reflected the view of the Court.

The Commission urges that this case be determined "without casting any doubt upon the right and duty of registered stock exchanges to discipline their members who are engaged in practices contrary to just and equitable principles of trade, including violations of the Securities Exchange Act of 1934, and the Commission's rules thereunder, regardless of whether such practices relate to listed or unlisted securities, and whether a non-member may be indirectly adversely affected." [7] The Commission has long recognized that what a member of an exchange does as an over-the-counter dealer has an important connection with his membership in the Exchange. In a number of cases members have been expelled or suspended from membership on securities exchanges as a penalty for derelictions in their over-the-counter business. See e. g. Walston and Co., 7 S.E.C. 937 (1940), modified 9 S.E.C. 660 (1941), petition for review dismissed, 121 F.2d 1019 (9th Cir. 1941); Archer & Co., 11 S.E.C. 635 (1942), aff'd, 133 F. 2d 795 (8th Cir. 1943); Robert DeForest Boomer, 13 S.E.C. 102 (1943); Mason, Moran & Co., 35 S.E.C. 84 (1953); R. L. Emacio & Co., 35 S.E.C. 191 (1953).

The New York Stock Exchange is performing a vital public function. Its standing and reputation are important to the national economy.

"The bill proceeds on the theory that the exchanges are public institutions," said the House Committee Report [8] referring to the bill which later became the Securities Exchange Act of 1934.

Mr. Justice Douglas, when he was Chairman of the Securities and Exchange Commission, said:

"I have always regarded the exchanges as the scales upon which that great national resource, invested capital, is weighed and evaluated. Scales of such importance must be tamper-proof, with no concealed springs—and there must be no laying on of hands. * * * Such an important instrument in our economic welfare * * * must be surrounded by adequate safeguards." [9]

It is highly important for the proper operation of the Exchange as a public institution that its membership and procedures continue to enjoy the confidence of investors. The reputation of the Exchange is a valuable asset from the public point of view. The Exchange must have sufficient power of discipline over its members to enable it to enforce the high standards of conduct which the Act contemplates. If it is to have the requisite power it cannot be hamstrung by an unjustifiable limitation based upon whether its members are at the moment dealing in listed or in unlisted securities.

We conclude that the statute gives the Commission and the Exchange disciplinary powers over members of the Exchange with respect to their transactions in over-the-counter securities, and that the policy of the statute requires that the Exchange exercise these powers fully. In the exercise of such powers the Exchange is not subject to the restrictions of the Sherman Act.

The next question presented is whether this immunity applies regardless of the correctness or, indeed, reasonableness of a particular decision. Does a securities exchange, while acting within the general scope of its authority to discipline its members, fall into the ambit of the Sherman Act when a particular decision is arbitrary or unreasonable? To find that the Sherman Act applies in such a situation would go far toward defeating the statutory policy of self-regulation. If securities exchanges were in constant danger of subjecting themselves to liability under the anti-trust laws for any misapplication of their disciplinary powers, they would understand-

---

7. Brief of Securities and Exchange Commission, *amicus curiae*, p. 14.

8. H.R.Rep. No. 1383, 73rd Cong., 2d Sess. 15 (1934).

9. Douglas, Democracy and Finance (1940) 64, 65.

ably be relunctant to fulfill their obligations under the Securities Exchange Act. Cf. Booth v. Fletcher, 69 App.D.C. 351, 101 F.2d 676, 680 (1938), cert. denied, 307 U.S. 628, 59 S.Ct. 835, 83 L.Ed. 1511 (1939). When the exchanges are acting other than in "the clear absence of all jurisdiction over the subject matter," Bradley v. Fisher, 80 U.S. 335, 351, 20 L.Ed. 646 (1871), they are secure from such liability to a person aggrieved by their action. In the exercise of the powers which they are required by the statute to exercise the exchanges must be immune from prosecution under other legislation. Cf. Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

■■ What has been said does not mean that if the action of the Exchange was arbitrary or unreasonable appellees are without a remedy. The Exchange is exempt from the restrictions of the Sherman Act because it is exercising a power which it is required to exercise by the Securities Exchange Act. The availability of judicial review is a necessary concomitant of the exercise of such power. See Steele v. Louisville & Nashville Railroad Company, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Jaffe, The Right to Judicial Review, 71 Harv.L.Rev. 401, 769, 800–808 (1958). Compare Administrative Procedure Act § 10a, 5 U.S.C. § 1009(a) (1958). That the statute is silent on the question of judicial review is, of course, not decisive. Estep v. United States, 327 U.S. 114, 120, 66 S.Ct. 423, 90 L.Ed. 567 (1946).

■ The lower court, examining the situation for possible application to it of the "rule of reason" under the Sherman Act, found that the Exchange had acted "arbitrarily and unreasonably in directing that plaintiff's wire connections be severed." 196 F.Supp. at 227. Whatever conclusion one might reach on this issue, the procedure of the Exchange in failing to give prior notice of its action and in refusing to inform Silver of the charges made against him and to give him an opportunity to rebut these charges may well be characterized as arbitrary.

■ The question therefore arises as to whether the judgment below should be affirmed because an injunction might have been available to the plaintiff had the suit sought relief from the Exchange's arbitrary action rather than the remedies provided by the Clayton Act. This is not, however, a case for the application of the accepted rule that a judgment which grants an appropriate remedy will not be reversed merely because the correct result was reached on an erroneous theory. See Fed.Rules Civ. Proc. 54(c), 28 U.S.C.A.; Mackintosh v. Estate of Marks, 225 F.2d 211 (5th Cir. 1955); Psinakis v. Psinakis, 221 F.2d 418, 423 (3rd Cir. 1955); Shelley v. Union Oil Co., 203 F.2d 808, 14 Alaska 287, (1953). In this case we cannot be certain that, if the plaintiff had not proceeded under the Sherman Act, the parties would not have treated the controversy quite differently. The plaintiff, for example, might even have sought another remedy. The Exchange might have determined to grant the plaintiff an opportunity to rebut the charges made against him. Had the district court been guided by the principles set forth in this opinion, it might have chosen to hold a hearing and to hear witnesses instead of deciding the issues by summary action and injunction.

We therefore reverse and remand to give the parties and the district court an opportunity to reconsider the case in the light of our opinion.

WATERMAN, Circuit Judge (dissenting).

I dissent. I would affirm on the opinion of Judge Bryan below, reported at 196 F.Supp. 209 (S.D.N.Y.1961).

The majority opinion gives the appellant a significant privilege to which I believe no statute entitles it. Moreover, without mentioning that they have done so, the majority have apparently discred-

ited that portion of the landmark decision of Judge Medina in United States v. Morgan, 118 F.Supp. 621 at 697 (S.D. N.Y.1953), in which he discussed the statutory scheme of the Securities Acts of 1933 and 1934 and stated that those acts do not create any implied exemptions from the Sherman Act.

In other provisions of the Securities Exchange Act, namely those sections governing over-the-counter brokers' and dealers' associations, 52 Stat. 1070 (1938), 15 U.S.C.A. § 78o–3, the draftsmen of our securities statutes provided an explicit exemption from the antitrust laws. 15 U.S.C.A. § 78o–3(n). The presence of explicit exemptions in certain parts of a statute should make us hesitate to find a congressional intention to create implicit exemptions elsewhere in the same legislation.

In United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939), involving the scope of the Agricultural Marketing Agreement Act, 7 U.S.C.A. §§ 601–659, it was argued that by the passage of that regulatory legislation Congress had created an implied exemption from the antitrust laws. The Supreme Court rejected the argument, stating, at pp. 197–198, 60 S.Ct. at p. 188, 84 L.Ed. 181:

"In the opinion of the court below, the existence of the authority vested in the Secretary of Agriculture, although unexercised, wholly destroys the operation of § 1 of the Sherman Act with respect to the marketing of agricultural commodities.

"We are of the opinion that this conclusion is erroneous. No provision of that purport appears in the Agricultural Act. While effect is expressly given, as we shall see, to agreements and orders which may validly be made by the Secretary of Agriculture, there is no suggestion that in their absence, and apart from such qualified authorization and such requirements as they contain, the commerce in agricultural commodities is stripped of the safeguards set

up by the Anti-Trust Act and is left open to the restraints, however unreasonable, which conspiring producers, distributors and their allies may see fit to impose. We are unable to find that such a grant of immunity by virtue of the inaction, or limited action, of the Secretary has any place in the statutory plan. We cannot believe that Congress intended to create 'so great a breach in historic remedies and sanctions.'

"It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible."

As a further reason for not reading in any implied exemption in that statute the court also pointed out, at 200–01, that the Agricultural Marketing Act provided explicit exemptions to the antitrust laws in those areas where that was the congressional intention. And in State of Georgia v. Pennsylvania R.R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), the Court stated, at pp. 456–457, 65 S.Ct. at pp. 725–726, 89 L.Ed. 1051:

"These carriers are subject to the anti-trust laws. United States v. Southern Pacific Co., 259 U.S. 214 [42 S.Ct. 496, 66 L.Ed. 907]. Conspiracies among carriers to fix rates were included in the broad sweep of the Sherman Act. United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290 [17 S.Ct. 540, 41 L.Ed. 1007]; United States v. Joint Traffic Ass'n, 171 U.S. 505 [19 S.Ct. 25, 43 L.Ed. 259]. Congress by § 11 of the Clayton Act entrusted the Commission with authority to enforce compliance with certain of its provisions 'where applicable to common carriers' under the Commission's jurisdiction. It has the power to lift the ban of the anti-trust laws in favor of carriers who merge or consolidate (New York Central Securities Corp. v. United States, 287 U.S. 12, 25–26 [53 S.Ct. 45, 48, 49, 77 L.Ed. 138]) and the duty to give

weight to the anti-trust policy of the nation before approving mergers and consolidations. McLean Trucking Co. v. United States, 321 U.S. 67 [64 S.Ct. 370, 88 L.Ed. 544]. But Congress has not given the Commission comparable authority to remove rate-fixing combinations from the prohibitions contained in the anti-trust laws. It has not placed these combinations under the control and supervision of the Commission. Nor has it empowered the Commission to proceed against such combinations and through cease and desist orders or otherwise to put an end to their activities. Regulated industries are not *per se* exempt from the Sherman Act. United States v. Borden Co., 308 U.S. 188, 198 et seq., 60 S.Ct. 182, 188 et seq., 84 L.Ed. 181. It is true that the Commission's regulation of carriers has greatly expanded since the Sherman Act. See Arizona Grocery Co. v. Atchison, T. & S. F. R. Co., 284 U.S. 370, 385–386 [52 S. Ct. 183, 184, 185, 76 L.Ed. 348]. But it is elementary that repeals by implication are not favored. Only a clear repugnancy between the old law and the new results in the former giving way and then only *pro tanto* to the extent of the repugnancy. United States v. Borden, supra, pp. 198, 199, 60 S.Ct. at pages 198, 199, 84 L.Ed. 181. None of the powers acquired by the Commission since the enactment of the Sherman Act relates to the regulation of rate-fixing combinations. Twice congress has been tendered proposals to legalize rate-fixing combinations. But it has not adopted them. In view of this history we can only conclude that they have no immunity from the anti-trust laws."

I believe with Judge Bryan that, as applied to the facts in this case, there is no clear repugnancy between the Securities Exchange Act of 1934 and the Sherman Act, which requires the blanket exemption from the antitrust law which the majority here finds.

The majority believes that it can leave enforcement of the antitrust laws in the hands of the Securities and Exchange Commission despite the fact that that agency's expertise does not involve matters of antitrust law, and it does not appear that Congress intended that the Commission was to be an overseer of the antitrust laws. I do not subscribe to that belief.