319 F.2d 340
 Maurice BARNETT, Jr., and Investment Service Company, Petitioners,
v.
UNITED STATES of America and Orval L. Dubois, Secretary of
the Securities and Exchange Commission, Respondents.
 No. 17179.
 United States Court of Appeals Eighth Circuit.
 July 2, 1963.
 
 Haskell, Imes, Kansas City, Mo., for petitioners.
 
 
 1
 David Ferber, Associate Gen. Counsel, Securities and Exchange Commission, Washington, D.C., for respondent and Peter A. Dammann, Gen. Counsel, and Dolph B. H. Simon, Atty., Securities and Exchange Commission, Washington, D.C., were with him on the brief.
 
 
 2
 Before SANBORN and BLACKMUN, Circuit Judges, and STEPHENSON, District judge.
 
 
 3
 STEPHENSON, District Judge.
 
 
 4
 This case is before the court on the petition of Maurice Barnett, Jr. and Investment Service Company for review of an administrative order of the Securities and Exchange Commission which order revoked the registration of Investment Service Company as a broker and dealer in securities and found Maurice Barnett, Jr. to be a cause of the revocation. The Commission's order was entered pursuant to Sec. 15(b)[1] and Sec. 15A(b)(4),[2] Securities Exchange Act of 1934 as amended.
 
 
 5
 Initially a hearing was held before a hearing examiner on charges that between November 1957 and November 1959 the registrant, Investment Service Company, together with or aided and abetted by Barnett, willfully violated anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934 and rules thereunder, in that: (1) it made various false and misleading statements in connection with the offer and sale of the common stock of Westminster Corporation; (2) it sold stock of Colotah Corporation at prices in excess of prevailing market prices of such stock without disclosing such market price, and (3) it failed to execute a customer's order to sell Westminster stock. The hearing examiner shbmitted a recommended decision in which he found the willful violations charged and recommended that registrant's registration be revoked and that Barnett be found a cause of such revocation. Petitioners filed exceptions. The Commission thereafter entered its order and findings. The Petition for review pursuant to Section 25(a) of the Act, 15 U.S.C. 78y(a) is now before us for determination.
 
 
 6
 Petitioner, Investment Service Company, was purchased on May 1, 1957 by Petitioner, Maurice Barnett, Jr., and since that time he has remained a major stockholder and was its president except for a brief period when he acted as chairman of the board. The company specialized in the purchase and sale of mining securities in the over-the-counter market. In connection with the charge of making various false and misleading statements in connection with the offer and sale of Westminster stock, the commission found that Barnett was approached in July 1957 by the president of Westminster who was interested in establishing a secondary market in Westminster stock. As a result of this conference and conferences with several other officers of Westminster, Barnett and Westiminster agreed that Barnett would prepare and distribute a brochure recommending Westminster stock to broker-dealers and potential investors in exchange for $2,500 and 167,718 shares of Westminster stock which was 2/7 of the shares held by the management of Westminster. Barnett prepared 5500 copies of a 16 page brochure entitled 'WE RECOMMEND FOR IMMEDIATE PURCHASE-- THE WESTMINSTER CORPORATION' of which 5,000 copies were distributed. It is undisputed that the brochure contained false and misleading statements as to the value of the oil and mining properties which were the primary assets of Westminster. Petitioners do not disagree with the fact that the brochure contained false statements, but contend that the statements were based on facts given to Barnett by the officers of Westminster and which were relied upon by him as being true.
 
 
 7
 In the findings and opinion of the Commission it is stated: 'Respondents deny that they had any knowledge of the fraudulent nature of the statements in the brochure. The record shows, however, that Barnett knew that many of these representations were false or misleading, and should have made diligent inquiry with respect to the accuracy and adequacy of a number of the other representations made.' The Commission continues its opinion by setting forth a number of specific instances in which Barnett's connection with Westminster was such that Barnett knew or should have known of the fraudulent nature of the statements in the brochure. In addition to these specific statements which the Commission set out as being fraudulent and which the Commission found that Barnett either knew were false and misleading or should have known were false and misleading, the Commission made the following finding as to other statements in the brochure:
 
 
 8
 'With respect to the remaining statements, with the possible exception of those also appearing in the audited financial statements, the duty to exercise a high degree of care that rested on registrant and Barnett was not discharged by Barnett's asserted reliance on the selfserving statements by Westminster officials. Indeed, once Barnett became aware that some of the information furnished him was unreliable, he should have exercised the greatest diligence in verifying the other information he included in the brochure. He could do no less and still satisfy the duty owed to investors to make accurate and adequate representations in the brochure, and we find, under all the circumstances, that registrant and Barnett were grossly negligent or indifferent as to the truth and adequacy of such other information.'
 
 
 9
 Petitioners claim that this finding by the Commission is not sufficient to support a revocation because the finding is just one of gross negligence and not one of actual knowledge to constitute willfulness as is required by the statute. It is noted, however, that the commission's finding of gross negligence goes only to the 'truth or adequacy of such other information.' The commission did find that Barnett knew that some of the representations in the Westminster brochure were false or misleading and in its conclusions as to violations the commission concludes 'that registrant * * * willfully violated (the statute and rules) thereunder in the offer and sale of Westminster stock by means of false and misleading statements of material facts * * *.'
 
 
 10
 To set aside the order of the Commission would require this court to upset the commission's finding of fact. This we cannot do as long as the facts are supported by substantial evidence. Securities Exchange Act, Section 25(a) ( 15 U.S.C. 78y(a)). See Archer v. Securities and Exchange Commission, 8 Cir., 1943, 133 F.2d 795, at 799. An examination of the transcript clearly shows that there is substantial evidence to support the findings of fact. There is ample evidence that Barnett knew false and misleading statements were contained in the brochure. A dealer cannot close his eyes to obvious facts and come into court claiming lack of knowledge. Berko v. Securities and Exchange Commission, 2 Cir., 1963, 316 F.2d 137; Securities and Exchange Commission v. Culpepper, 2 Cir., 1959, 270 F.2d 241, 251; Securities and Exchange Commission v. Mono-Kearsarge Consolidated Mining Co., D. Utah, 1958, 167 F.Supp. 248, 259.
 
 
 11
 As to the Colotah transaction the Commissioners found that during January 1959 the company bought Colotah stock at 3 to 5 cents per share and sold the same at 5 to 7 cents per share, including mark-ups of 25% To 67% Over and above the cost of this stock on the same day or the prior day, and that these sales, 31 in number and aggregating 132,000 shares, were made without disclosing to the customer the amount of the mark-up. The petitioners defended this practice on the ground that a great risk was involved and that the mark-up policy was justified because the stocks were in the 'penny' category. The Commission rejected these defenses.
 
 
 12
 In its petition for review to this court, petitioners urged that there was no evidence that petitioners failed to disclose the mark-up to purchasers or that the mark-up was excessive. The Commission found that the amount of markup was not disclosed. Barnett did not deny that there was no disclosure and in the absence of some explanation on the part of the petitioners there is an inference that had Barnett testified on this subject it would have been adverse to him. See N. Sims Organ & Co., Inc. v. Securities & Exchange Commission, 2 Cir., 1961, 293 F.2d 78, 80-81.
 
 
 13
 The National Association of Securities Dealers, Inc. has a mark-up policy which indicates that mark-ups somewhat higher than the normal 5% Maximum may be justified for stocks selling for less than $10 per share. This of course is only a general guideline. The test of a fraud upon customers depends upon whether the selling price is reasonably related to the prevailing market price. See Charles Hughes & Co. v. Securities and Exchange Commission, 2 Cir., 1943, 139 F.2d 434, 437. In the absence of evidence to the contrary the commission was entitled to consider registrant's own contemporaneous cost as evidence of current market price. Samuel B. Franklin & Co. v. Securities and Exchange Commission, 9 Cir., 1961, 290 F.2d 719. The commission's finding that the Colotah stock was sold at prices unreasonably related to the prevailing market prices without disclosing the same to its customers is sufficiently supported in the record.
 
 
 14
 As to the failure to execute a customer's order to sell, the commissioners found that on December 30, 1957, James C. Chandler wrote the company indicating a desire to sell 660 shares of Westminster stock and asking the price which the petitioners would be willing to pay. This letter was answered on January 2, 1958, by Barnett, as president of the company, quoting the market as fifty cents bid, one dollar asked, and indicated a desire t execute the sale. On January 7 Chandler wrote 'I accept 50cents/share for these 660 shares as per your letter.' On January 9 the Investment Service Company accepted the sell order stating that they would execute it 'at the earliest possible date.' On January 20 Chandler wrote the company telling them to return by February 20 the stock not sold by that date. On March 9 Chandler again wrote to the company asking that his stock be returned to him. On March 12 the company sent Chandler the stock with regrets that they had not been able to dispose of the stock. During the time that the company held Chandler's sell order they had been able to sell 381.66 shares of Westminster stock for $1.00 per share and had sold 500 shares which the company held for 80cents per share, and on February 7, 1958, the company had purchased 1825 shares of Westminster at 50cents per share from a customer who Barnett testified had placed his sell order prior to Chandler's. Barnett testified that he would have executed Chandler's order if Chandler 'had indicated any willingness to co-operate and if he had not threatened * * *. After Mr. Chandler threatened me I just thought the devil with him.' The threat referred to is not shown in the record unless it referred to the March 9 letter previously referred to, which was written 20 days after the date on which he had asked for the return of the unsold portion of the stock, wherein it was stated 'At the present I will say only that your method of handling this account has been at least unethical if not illegal. Either return my stock or a check for this stock at once or I shall take the proper action.' The commission found that 'under these circumstances it is immaterial that registrant assertedly effected all its transactions on a principal basis and never intended to engage in any agency transactions. Having undertaken to sell (Chandler's) stock at the earliest possible date, registrant owed a fiduciary duty to him to carry out the sell order with due diligence and not give precedence to another customer's request * * * merely because such request was received prior to (Chandler's) agency order. * * * Moreover, registrant was under a duty to sell the stock at the highest possible price. Instead, it sold Westminster stock for its own account at prices substantially higher than 50cents per share, and, as we have seen, falsely represented to (Chandler) when it returned the shares to him that it had been unable to execute his sell order.'
 
 
 15
 On this petition for review the petitioner's only objection to this finding is that there was a failure of proof that petitioner was acting as an agent rather than as a principal in failing to execute to sell order. Although the commission did not have the benefit of Chandler's testimony and had to work solely from the correspondence set out above, there certainly is substantial evidence to sustain the commission's conclusions.
 
 
 16
 Statements in its letters that 'We will be glad to execute any order that you may care to place either at the 50cents quoted bid price, or at some higher fixed price' and 'We accept your sell order and will endeavor to execute it for you at the earliest possible date' certainly is in the language of someone intending to act as agent and not as principal or at least would give the impression that an agency was intended. See Archer v. Securities and Exchange Commission, 8 Cir., 1943, 133 F.2d 795, 801.
 
 
 17
 Petitioner's final contention is that the hearing examiner was biased in favor of the Securities and Exchange Commission. This challenge of the hearing examiner was first raised on this appeal. Section 25(a) of the Securities Exchange Act provides in part: 'No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission.'[3] This final ground for review is not properly before the Court.
 
 
 18
 The order of the commission is affirmed.
 
 
 
 [1]
 15 U.S.C. 78o
 
 
 [2]
 15 U.S.C. 78o-3
 
 
 [3]
 15 U.S.C. 78y(a)